# In the United States Court of Federal Claims

**FOR PUBLICATION**

Nos. 20-34L, 20-48L & 20-159L
(Filed: May 16, 2024)

|  |  |
|---|---|
| **COLLECTIVE EDGE, LLC**, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **FERG'S SPORTS BAR & GRILL, INC.**, | ) |
| | ) |
| *Consolidated Plaintiff,* | ) |
| | ) |
| and | ) |
| | ) |
| **CARLOS LOPEZ, JR. &** | ) |
| **COLLEEN A. LOPEZ**, | ) |
| | ) |
| *Consolidated Plaintiffs,* | ) |
| | ) |
| v. | ) |
| | ) |
| **UNITED STATES**, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Lindsay S. C. Brinton* and *Meghan S. Largent*, Lewis Rice, St. Louis, MO, and *D. Tobyn DeYoung* and *James A. Helinger, Jr.*, Helinger DeYoung, St. Petersburg, FL, for plaintiffs. With them on the briefs were *Michael Armstrong* and *T. Hunter Brown*, Lewis Rice, St. Louis, MO.

*Frances B. Morris* and *Samantha G. Peltz*, Trial Attorneys, Natural Resources Section, Environmental & Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant. With them on the briefs was *Todd Kim*, Assistant Attorney General, Environmental & Natural Resources Division, U.S. Department of Justice, Washington, DC.

## POST-TRIAL OPINION AND ORDER[1]

**BONILLA, *Judge*.**

This suit addresses the measure of just compensation due property owners in St. Petersburg, Florida adjacent to and underlying a 0.86-mile railroad easement. Following the issuance of a Notice of Interim Trail Use or Abandonment (NITU) that resulted in railbanking and an easement for interim trail use, the adjacent landowners brought inverse condemnation actions against the United States under the Takings Clause of the Fifth Amendment to the United States Constitution.[2] The government conceded liability for taking plaintiffs' property. Plaintiffs now seek damages for the diminished value of their land attributable to the new recreational trail use easement which trumped their prospective fee simple ownership upon the extinguishment of the historical railway easement. Defendant contends the valuations and claimed damages are inflated.

Pending before the Court are defendant's motion for reconsideration filed pursuant to RCFC 59 with respect to the nature and extent of the alleged Fifth Amendment taking (ECF 172), the parties' cross-motions for partial summary judgment pursuant to RCFC 56 related to the size of one parcel of land vis-à-vis the railway easement (ECF 134 & 144), and the evidence presented at trial on damages. For the reasons set forth below, defendant's motion for reconsideration on the liability issue is DENIED, plaintiffs' motion for partial summary judgment on the property size issue is DENIED, defendant's cross-motion for partial summary judgment on the property size issue is GRANTED, and plaintiffs are awarded just compensation in the aggregate amount of $17.859 million, plus interest.

## BACKGROUND

Over a century of history precedes the facts of this case. In 1885, Russian émigré Pyotr A. Dementyev (a/k/a Peter Demens) established the Orange Belt Railway between central Florida and St. Petersburg, a city named after his childhood

---

[1] This case was transferred to the undersigned for adjudication on February 28, 2022, pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims (RCFC). At that time, and continuing through March 24, 2023, the parties engaged in fact and expert discovery. Pretrial briefing thereafter continued through January 15, 2024. Commencing with site visits, trial took place in Tampa, Florida between January 22 and February 1, 2024.

[2] Plaintiffs initially filed separate actions: *Collective Edge, LLC v. United States*, No. 20-34 (Fed. Cl. filed Jan. 13, 2020); *Ferg's Sports Bar & Grill, Inc. v. United States*, No. 20-48 (Fed. Cl. filed Jan. 14, 2020); and *Lopez v. United States,* No. 20-159 (Fed. Cl. filed Feb. 18, 2020). At defendant's request, and over plaintiffs' objections, the cases were consolidated on August 12, 2020.

home.  The 152-mile-long rail line–carrying produce and passengers from Sanford to Tampa Bay–became one of the longest narrow-gauge railroads in the United States.[3]

Throughout its 140-year history, a number of owners have operated the Orange Belt Railway.  Mr. Demens, as an investor in a sawmill and construction company, first supplied railroad ties to the planned Orange Belt Railway.  When the fledgling railroad defaulted on its debts, he took charge only to find himself in the same predicament several years later.  Due to rising construction debt, Mr. Demens sold the railroad to financier Edward Stotesbury in 1889 who, in 1893, reorganized the rail line as the Sanford and St. Petersburg Railroad.  The Great Freeze of 1894–95 devastated northern Florida's citrus trade and precipitated businessman Henry B. Plant's 1895 purchase and the rail line's subsequent operation under his Plant System (i.e., combined South Florida Railroad and Orange Belt Railway).  In 1902, the Atlantic Coast Line Railroad acquired the Plant System, eventually merging with rival Seaboard Air Line Railroad to form the Seaboard Coast Line Railroad on July 1, 1967.  Thereafter, in 1980, the Chessie System and Seaboard Coast Line Industries united, creating CSX Corporation to serve the eastern half of the United States.  CSX Corporation evolved into a multimodal company in 1984 when it acquired control of the barge unit of American Commercial Lines, Inc.  Two years later, the corporate entity became the present-day CSX Transportation (CSX) currently headquartered in Jacksonville, Florida.  Today, certain segments of the railway remain active, including the 48.6-mile Clearwater Subdivision connecting downtown Tampa to St. Petersburg.

Relevant here is a 0.86-mile segment between mileposts 897.57 and 898.43 in Pinellas County.  The segment runs south from 5th Avenue North and curves east along 1st Avenue South, ending at 9th Street North in downtown St. Petersburg:



PX-007 at 10 (0.86-mile rail line segment highlighted in green).  Aside from a brief period in the 1990s, this segment has not been used as an active rail line for decades.[4]

---

[3] *See* https://perma.cc/7QC4-T9Q7 (last visited May 14, 2024).

[4] In the 1990s, the Ringling Brothers and Barnum & Bailey Circus used a portion of the rail line segment to transport animals and equipment.

Since acquiring ownership of the rail line, as discussed below, CSX entered into various agreements for the use of the land encumbered by the railway easement.  To the extent the railroad ties and tracks remain, they are in disrepair or buried, and the street crossings are now paved.

The contested segment runs through the "Edge District," considered the epicenter of art, culture, restaurants, and sports and entertainment in downtown St. Petersburg.  The district is positioned within the "Golden Rectangle"[5]–an area that has experienced significant growth and redevelopment over the last twenty years–anchored by Tropicana Field: home of Major League Baseball's Tampa Bay Rays. [6, 7]



The area also includes mixed-use developments in various phases (i.e., planned, under construction, complete) as well as the "Historic Gas Plant District Redevelopment," expected to break ground in late 2024.[8]

[5] The Golden Rectangle (depicted above) is bordered by Interstate 275 along the west, Interstate 375 to the north, Interstate 175 to the south, and Tampa Bay to the east. The Edge District lies between Dr. Martin Luther King, Jr. Street, 16th Street, 1st Avenue North, and 1st Avenue South.

[6] According to United States Census Bureau records, the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area is the eighteenth largest in the United States and, between 2010 and 2020, the area's population increased by 14.09 percent.  *See* PX-358.

[7] Tropicana Field opened in 1990 and thereafter served as the home for sporting events and teams, including the Tampa Bay Lightning of the National Hockey League (1993 through 1996) and the Tampa Bay Rays (f/k/a Devil Rays) of Major League Baseball (since 1998).  *See* https://perma.cc/3298-TA8R (last visited May 14, 2024).

[8] On September 19, 2023, the City of St. Petersburg, Pinellas County, the Tampa Bay Rays, and Hines Development agreed to move forward with a three-phase $6 billion redevelopment plan of the 86-acre

## I.     Collective Edge

The first property at issue is owned by PTM Partners, LLC, a Miami-based real estate investment and development firm.   Founded by Nicholas Pantuliano (Chief Development Officer and Chief Operations Officer) Michael Tillman (Chief Executive Officer and Chief Investment Officer), and Scott Meyer (Chief Financial Officer), PTM Partners seeks to "provid[e] luxury housing that is accessibly priced."[9] The principals of PTM Partners have over eighty-five years' combined experience and are responsible for over $8 billion in construction projects and $20 billion in real estate transactions.   Since 2018, the group has developed mixed-use properties, primarily multifamily apartments and retail space, in Washington, DC (Watermark), Virginia (Viridium), and Florida (1900 Biscayne, 2000 Biscayne, and Grand Central). PTM Partners has two ongoing construction projects in the Edge District: "Edge Collective" and "Edge Collective II."

PTM Partners' portfolio includes Collective Edge, LLC which owns four parcels of land located at the southeast corner of Central Avenue and 13th Street South in the Edge District.[10]   PTM Partners purchased the then-primarily vacant 1.702-acre (74,135 square feet)[11] site from Tricera Eastman, LLC on October 7, 2019, for $13 million and started construction on the project's first phase—Edge Collective—in January 2022.[12]   Formerly a 120-space, asphalt-paved and striped surface parking lot, the now seven-story, 163-room Moxy St. Petersburg Downtown hotel (a/k/a Moxy St. Pete) anchors the project, featuring a rooftop pool, bar, and restaurant, among other amenities.   As part of the project's first phase, PTM Partners also refurbished

---

site of the current baseball stadium.  *See* https://perma.cc/6HNR-6SL9 (last visited May 14, 2024).  The current redevelopment plans include 4,800 residential units, 750,000 square feet of entertainment space (including a 4,000-seat concert venue), and 1.4 million square feet of office, medical, and commercial space.  A new 30,000-seat ballpark is slated to anchor the project, occupying 17.3 of the 86 acres allocated.  *See* https://perma.cc/9DQL-SG5U (last visited May 14, 2024).

[9] *See* https://perma.cc/Z3VT-9CVA (last visited May 15, 2024).

[10] The property tax identification numbers assigned to the four parcels owned by Collective Edge are 24-31-16-14544-000-0280, 24-31-16-53478-000-0210, 24-31-16-14544-000-0250, and 24-31-16-53478-000-0170.  The street address is 1246 Central Avenue, St. Petersburg, FL 33705.

[11] The parties' appraisal reports used different property measurements (i.e., square footage). For clarity, unless explicitly addressed or stated otherwise, the differences were minimal and the Court adopts the property sizes used by plaintiffs' appraisal experts which, in turn, are based on the dimensional characteristics prepared by Eric E. Rahenkamp of Rahenkamp Design Group, Inc. (Rahenkamp Design). In accordance with Federal Rule of Evidence 702, and without objection, the Court qualified Mr. Rahenkamp and allowed his testimony "as an expert in the fields of landscape architecture and land planning."  Trial Tr. Vol. 2 at 227.

[12] The project's second phase—Edge Collective II—includes the construction of 350 multifamily apartments with hospitality-level amenity spaces as well as 45,000 square feet of commercial and retail space and 260 parking spaces on an adjacent property.  *See* https://perma.cc/35JS-EYJ2 (last visited May 14, 2024).

an existing three-story building–known as the Gas Plant Building–now located next to the Moxy Hotel.[13]  The two buildings are adjoined with an outdoor garden and retail space.  Originally constructed in 1926, the refurbished 31,436 square foot Gas Plant Building offers 8,000 square feet of food and beverage space on the ground floor and 16,000 square feet of commercial space on the upper floors.[14]

The four Collective Edge parcels are curved along the southern property line on 1st Avenue South and bound on the north by Central Avenue, to the west by 13th Street South, and abuts the proposed Collective Edge II development to the east. Severing the parcels' access to 1st Avenue South is the 9,983 square foot railway easement, ranging in width from 68 feet along 13th Street South to 15 feet at the eastern boundary.  The remainder of the parcel has access to 13th Street South, Central Avenue, Commercial Avenue South, and the adjacent alley.  The parcels are zoned Downtown Center 1 and the designated future use is Central Business District. The parties stipulated that the Collective Edge property is "adjacent to the railroad right-of-way described in the NITU" and that the easement was obtained via the Wright Condemnation Order dated April 28, 1888.  *See* ECF 13, 16.



ECF 83 at 50.

---

[13] The parties identified the existing building located at 1246 Central Avenue on the Collective Edge property differently throughout their briefs and at trial (e.g., "existing building," "historic building," "Gas Plant building").  For clarity, the Court refers to this building as the "Gas Plant Building."

[14] Despite the Gas Plant Building's storied past and significance to the community, the building was never historically designated by the City of St. Petersburg, addressed *infra*.

## II.    Ferg's Sports Bar & Grill, Inc.

The next two properties at issue are owned by St. Petersburg residents Mark Ferguson and his wife Sherry Ferguson. The Fergusons purchased a Sunoco gas station on November 23, 1992, in a "rundown area of downtown St. Pete, known as the 'Gas Plant District,'" and opened Ferg's Sports Bar & Grill (Ferg's).[15] From that seventy-five seat restaurant, Ferg's grew to offer seating for nearly 1,200 patrons and developed a backyard for an additional 3,000 guests during larger events. Over the last thirty years, the Fergusons have run the day-to-day operations of the establishment with their children.

Named by Cable News Network (CNN) as one of the "Top 101 Sports Bars" in the United States, Ferg's is known as the "headquarters" for Tampa Bay Rays' games and regularly draws large crowds.[16] To accommodate the crowds, Ferg's began leasing the railroad corridor running through its property from CSX on a year-to-year basis, beginning in 1994. The extra space allows Ferg's to host various events (e.g., concerts, pep rallies, fundraisers) and activities (e.g., corn hole and axe throwing tournaments) and provide a dog park for patrons and the community.[17] For the first twenty-five years, CSX charged Ferg's up to $5,000 a year in "rent" under threat of eviction upon thirty days' notice. In 2019, the rent jumped to $25,000 and, thereafter, increased up to $5,000 annually. *Compare* JX-87 *and* Trial Tr. Vol. 2 at 77–78 *with* JX-88.

Ferg's owns three tax parcels abutting Central Avenue in downtown St. Petersburg: two comprise "Ferg's South"–where the sports bar is located–and the third is referred to as "Ferg's North." Ferg's South is rectangular in shape and bound on the north by Central Avenue, on the east by 13th Street, on the south by 1st Avenue South, and abuts a neighboring property to the west.[18] Improved with a 7,477 square foot commercial building constructed in 1936, the parent tract[19] is 1.32 acres (57,322 square feet) and includes the temporary structures noted above

---

[15] *See* https://perma.cc/7TMB-XMW3 (last visited May 14, 2024). Mr. and Ms. Ferguson are sixty percent owners of Ferg's. To buy the property in 1992, the Fergusons raised "small chunks of money" from family and friends who now own forty percent of the corporation. *See* Trial Tr. Vol. 2 at 72.

[16] According to Ferg's' website, baseball games have generated the largest crowds in the restaurant's history, ranging from 17,000 people on Opening Day to more than 30,000 during the World Series. *See* https://perma.cc/7TMB-XMW3 (last visited May 14, 2024).

[17] *See* https://perma.cc/8U5Y-9R9T (last visited May 14, 2024).

[18] The property tax identification numbers assigned to the Ferg's South parcels are 24-31-16-14544-000-0310 and 24-31-16-09288-002-0010. The street address in 1320 Central Avenue, St. Petersburg, FL 33705.

[19] When a larger parcel of land is subdivided into smaller lots, the original (larger) parcel is called the "parent tract" or "parent parcel."

and open seating for restaurant patrons. The property is adorned with outdoor lighting and business signage,[20] complimented with paved parking areas, sheds and storage structures, and perimeter fencing. Dividing the property, the 0.68-acre (29,540 square foot) railroad easement at issue ranges from 50 to 100 feet wide. The Ferg's South parcels are located in the western portion of St. Petersburg's Central Business District–across 1st Avenue South from Tropicana Field and across 13th Street South from Collective Edge's Historic Gas Plant Building–and zoned Downtown Center 1.

Ferg's North is a vacant property across Central Avenue from the sports bar.[21] Irregular in shape, Ferg's North is bound on the north by 1st Avenue North, to the south by Central Avenue North, to the east by a neighboring property, and to the west by Booker Creek. Presently improved as a surface parking lot with concrete and timber wheel-stops, the parent tract is 0.78-acres (33,954 square feet). The railway easement runs through the eastern portion of the Ferg's property, ranges in width from 55 to 63 feet and is 0.30-acres (13,050 square feet). The property has no vertical improvements. Booker Creek runs through the western 15,472 square feet of the parcel, creating an 18,482 square foot upland area. The urban watershed flows through downtown St. Petersburg and part of the greater 8,700-acre "Booker Creek Preserve"–the largest natural area in Pinellas County, primarily consisting of forested wetlands and pine flatwoods.[22] Booker Creek Preserve was established in 1992 by the Pinellas County Board of County Commissioners for the conservation, protection, and restoration of its native natural resources. The Pinellas County government and Southwest Florida Water Management own the preserve, whereas the county Parks and Conservation Resources Department manage it. The property remains undeveloped aside from twenty-nine parking spaces reserved for sports bar employees.

The Ferg's North parent parcel is designated Central Business District, and the City of St. Petersburg Zoning Map places the property within the Downtown 1 zoning district. Relevant here, the parties stipulated that both Ferg's South and Ferg's North were obtained by virtue of the April 28, 1888 Wright Condemnation Order and that the railroad acquired an easement limited to railroad purposes. *See* ECF 16 at 2.

---

[20] Of note is an iconic globe sign from the former World Liquors on Central Avenue which closed in 2018 and was later demolished. Mr. Ferguson purchased the staple of downtown St. Petersburg since 1961 at auction and installed it at Ferg's. *See* https://perma.cc/GP7Z-UCEB (last visited May 14, 2024).

[21] The property tax identification numbers assigned to the Ferg's North parcel are 24-31-16-14544-000-0650 and a portion of 24-31-16-00000-130-0110. There is no designated street address.

[22] *See* https://perma.cc/NYS4-BJDB (last visited May 14, 2024).



ECF 83 at 54.

## III.   The Lopez Property

The final property at issue, referred to as the "Lopez property," is owned by real estate investors and St. Petersburg residents Carlos Lopez, Jr. and his wife Colleen A. Lopez ("the Lopezes").[23] Recognizing Central Avenue's commercial potential, the Lopezes bought this property in March 2004 as "a long-term investment[]." *See* Trial Tr. Vol. 2 at 165–66. At that time, development in the 500 block of Central Avenue was primarily limited to small shops, including retail and two bars. The Lopezes believed the area would eventually be rezoned and converted to mixed-use properties.[24]

---

[23] The property tax identification numbers assigned to the parcel owned by the Lopezes are 24-31-16-37512-012-0240 and a portion of 24-31-16-00000-130-0110. The street address is 269 16th Street North, St. Petersburg, FL 33705. In addition to this property, the Lopezes own a commercial building and several residential properties in St. Petersburg.

[24] "Mixed-use" properties are a type of commercial property that offer commercial (i.e., retail, office, storage) and residential (i.e., apartments, condos, townhomes) spaces. In most mixed-use properties, the residential square footage is significantly greater than its commercial counterpart. *See* https://perma.cc/72QX-L9SX (last visited May 14, 2024).

The Lopez property is located at the northeast corner of 16th Street North and Burlington Avenue North. The disputed parent tract is bound on the west by 16th Street North, on the east by a public (unnamed) alley, to the north by a neighboring property, and the south end abuts Burlington Avenue. The parent tract is 0.91 acres (39,699 square feet) and improved with an 8,316 square foot industrial/commercial building constructed in 1946 along with a chain link fenced parking area (including seven paved parking spaces) with a rolling gate at the southern end of the property. Despite the building's potential use for office space, a warehouse, or retail, the Lopezes have used it for storage.[25]

The property is encumbered by a 0.40-acre, 17,337 square foot railroad easement which is 100 feet wide and crosses both 16th Avenue North and Burlington Avenue North. The easement for interim trail use is a 100-foot-wide strip running diagonally along the southwestern portion of the Lopez property, resulting in an irregularly shaped property with reduced frontage on and access to 16th Street North and Burlington Avenue North. Because the Lopez property was historically used for industrial purposes and served by the former Orange Belt Railway, it remains zoned Industrial Traditional with a future land use designation of Industrial General. As discussed *infra*, the parties stipulated that "the railroad acquired a prescriptive easement in the right-of-way adjacent to [the Lopez] property." *See* ECF 33 at 1. "The parties also agree that, under Florida law, [the Lopezes] own the land underlying the easement segment[] of the right-of-way adjacent to the respective propert[y] to the centerline of the easement." ECF 33 at 2.



ECF 83 at 37.

---

At one time, Ms. Lopez used a portion of the space to display and store merchandise from her online toy store.

## IV.    Procedural History

In July 2019, the City of St. Petersburg filed an adverse abandonment action with the Surface Transportation Board (STB) seeking to convert the CSX rail line at issue into a public linear park and extend the existing Fred Marquis Pinellas Trail.[26] CRX responded by filing a verified notice of exemption under 49 C.F.R. part 1152 subpart F, requesting authorization to abandon the approximately 0.86-mile rail line. *See* 84 Fed. Reg. 47339-01 (Sept. 9, 2019).  Concomitantly, the City of St. Petersburg and a CSX subsidiary, Georgetown and High Line Railway Company, LLC (GHL), filed dueling requests for a NITU.  CSX expressed interest in negotiating an agreement for interim trail use/railbanking with GHL but declined to similarly engage the city, presumably seeking the larger payout.  The city's challenge to GHL as a qualified trail sponsor was unsuccessful.

The STB issued a NITU to CSX and GHL on January 10, 2020, invoking § 1247(d) of the National Trails System Act (Trails Act), 16 U.S.C. § 1241 *et seq.*  The NITU authorized CSX to abandon the 0.86-mile line and granted CSX permission to convey the rail line to GHL for a public recreational trial.  Although the NITU included the standard railbanking preservation provision under § 8(d) of the Trails Act, neither CSX nor GHL were authorized to convert the rail line into a public linear park.  The NITU was thereafter extended through June 2021.  Throughout these proceedings, the City of St. Petersburg, as well as the STB, expressed lingering skepticism regarding whether CSX and GHL were engaged in arms-length and good faith negotiations to facilitate the conversion of the rail line into a recreational trail. Ultimately, CSX and GHL executed a trail use agreement on June 17, 2021, and the railway corridor was transferred from CSX to GHL through a quitclaim deed recorded in Pinellas County.  The STB was duly notified a week later.

In the interim, shortly after the NITU issued, plaintiffs filed suit in this Court asserting a Fifth Amendment taking of their respective properties without just compensation.  Given the uncertainty of the ultimate outcome of the NITU when these cases were filed, it was not yet clear whether the alleged taking was temporary or permanent.  As discussed below, the necessary clarity came with the June 17, 2021 consummation of the trail use agreement between CSX and GHL.  Following defendant's August 19, 2021 concession of liability for a permanent taking of plaintiffs' properties as of the date of the NITU (i.e., January 10, 2020),[27] litigation

---

[26] "The Pinellas Trail is Florida's nationally acclaimed linear park and 'rail to trail' extending from St. Petersburg to Tarpon Springs."  *See* https://perma.cc/PB7T-DL2N (last visited May 14, 2024).  The recreational trail now stretches sixty miles.  *See id.*

[27] Throughout these proceedings, the parties cited either Friday, January 10, 2020, or Monday, January 13, 2020, to mark the effective date of taking.  The STB issued the NITU on January 10, 2020, and noticed the action on January 13, 2020.  For clarity, the Court uses January 10, 2020–the date of the government action.  At trial, when the date discrepancy was noted during the presentation of

shifted to the just compensation and interest due plaintiffs.  The Court held a damages trial between January 22 and February 1, 2024.

## DISCUSSION

Three principal matters are resolved herein.  The Court will first address the government's motion to reconsider whether a *permanent* taking occurred. Confirming the original decision, the Court next determines the damages owed plaintiffs for the government's taking.  In doing so, the Court rules upon the parties' cross-motions for summary judgment related to the size of the Lopez property.

## I.  Motion for Reconsideration

### A. Standard of Review

The Rules of this Court recognize the Court's inherent power to reconsider interlocutory orders.  Specifically, RCFC 54 provides in relevant part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

RCFC 54(b).  Reconsideration under this rule is permitted "as justice requires," meaning:

> [T]he court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts has occurred since the submission of the issue to the court.

*L-3 Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 48–49 (2011) (cleaned up) (quoting *Potts v. Howard Univ. Hosp.*, 623 F. Supp. 2d 68, 71 (D.D.C. 2009) (citing and quoting cases).  Likewise, RCFC 59 authorizes the Court to reconsider issues decided "upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States." RCFC 59(a)(1)(C).

---

expert witness testimony, and documented in the expert reports, both parties agreed the three-day delta was immaterial to the calculation of damages or otherwise legally insignificant to their affirmative claims and asserted defenses.

### B. Liability: Temporary versus Permanent Taking

The STB issued a NITU to CSX and GHL on January 10, 2020, and extended it through June 2021.  On June 17, 2021–during the pendency of the NITU–CSX and GHL executed a trail use agreement, and the railway corridor was transferred from CSX to GHL through a duly-recorded quitclaim deed.  The STB was notified one week later.  Following the consummation of the trail use agreement, the government conceded liability for a permanent taking of plaintiffs' properties as of the NITU date (i.e., January 10, 2020).  Based upon this confluence of events, the Court entered partial summary judgment in favor of all plaintiffs on the issue of liability on August 19, 2021.  Litigation then proceeded down the singular path of determining the just compensation due plaintiffs for the permanent taking of their properties.

Over two years later, the government attempted to reverse course.  The cited basis: a November 14, 2023 split decision (3-2) from the STB reopening and revoking the January 10, 2020 NITU and authorizing CSX to either abandon the rail line or reengage in negotiations with the City of St. Petersburg or another prospective trail sponsor.  The STB's unprecedented action was spurred by information shared by the United States Department of Justice that GHL had not taken any steps toward converting the railway easement into a recreational trail or linear public park.  That information was learned during discovery in this case.  After soliciting views from interested parties–including the Department of Justice, the City of St. Petersburg, and the Rails-to-Trails Conservancy (RTC)[28]–the STB concluded that CSX and GHL's failure to convert the railway into a trail or park in the two years since the trail use agreement violated the letter and spirit of the Trails Act.

CSX and GHL immediately filed a petition for review of the STB's decision in the United States Court of Appeals for the Eleventh Circuit pursuant to 28 U.S.C. §§ 2321(a), 2342(5), 2343, and 2344.  *See CSX Transp. Inc. v. Surface Transp. Bd.*, No. 23-13860 (11th Cir. filed Nov. 27, 2023).  Through that direct appeal, CSX and GHL challenged the STB's authority to rescind a NITU once a trail use agreement has been executed and, more granularly, to continuously monitor the progress made in a rail-to-trail conversion and reopen proceedings when deemed insufficient.  Thereafter, on January 12, 2024, at the request of the City of St. Petersburg, and with CSX's and GHL's concurrence, the STB granted a new NITU to facilitate the potential replacement of GHL as the trail sponsor for the subject rail line.  *See* PX-366.

---

[28] Established in 1986, the RTC is a nonprofit organization working with communities across the country to transform unused railway corridors into public linear parks and recreational trails.  *See* https://perma.cc/G33T-5M7A (last visited May 14, 2024).

By agreement of all parties, proceedings before the Eleventh Circuit are stayed through August 8, 2024, to facilitate the requested negotiations.[29]

Whatever games or tactical schemes CSX and GHL allegedly employed to avoid the City of St. Petersburg's efforts to convert the unused rail line into a public trail, there is no evidence the plaintiffs were aware of them. As discussed herein, the Moxy St. Pete hotel–recently constructed on the Collective Edge property–was designed facing *away from* 1st Avenue South and Tropicana Field. Because of the railway easement and consequent street access complications, the developers concluded an elevated parking garage ramp was the best use of the space facing the baseball stadium. Similarly, for thirty years, Ferg's Sports Bar & Grill–occupying the Ferg's South property–has paid CSX increasing annual rent to maintain temporary structures and fixtures on the otherwise unused railway easement. The easement bisecting the Ferg's North property–which abuts Booker Creek–is used by CSX as a paid public parking lot. Finally, the railway easement is fenced off from the Lopez property and similarly used by CSX as a paid public parking lot. If CSX seeks to maintain the status quo or truly abandon the railway easement–resulting in the impacted property owners enjoying a fee simple in exchange for the just compensation from this action–that is not for this Court to investigate or decide.[30] Nor does it appear that the City of St. Petersburg will relent in its ongoing quest to convert the CSX railway easement into a recreational trail.

In seeking to revisit the issue of liability, the government asks the Court to let the tug-of-war match between CSX and GHL and the City of St. Petersburg play out before deciding whether plaintiffs' properties were in fact taken and, if so, for how long (temporarily or permanently). But that is not the law. In *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), the United States Court of Appeals for the Federal Circuit held that a Fifth Amendment taking of private property occurs in the rails-to-trails context when the STB issues a NITU–i.e., "the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." *Id.* at 1233–34. Critical here, the appellate court further explained:

---

[29] CSX and GHL conditioned their concurrence on not conceding the propriety of the STB's recent actions or the invalidity of the original NITU. The rail line's current negotiations with the City of St. Petersburg are undertaken as a potential alternative to the Eleventh Circuit litigation.

[30] In 2006, for example, CSX sold a neighboring section of the railway easement to The Bainbridge Companies, LLC for an undisclosed amount. Headquartered in Wellington, Florida and Bethesda, Maryland, the luxury apartment developer and manager incorporated the former railway easement in constructing a six-story mixed-use apartment building opened in February 2019 and named after its address: 930 Central (Avenue) Flats. *See* https://perma.cc/Y8B2-4LLS (last visited May 14, 2024).

> [T]he NITU operates as a single trigger to several possible outcomes. It may, as in this case, trigger a process that *results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked*. Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment. In these circumstances, a temporary taking may have occurred. It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.

*Id.* (internal citations and footnotes omitted; emphasis added).  Here, as in *Caldwell*, a trail use agreement was reached, and the NITU in effect at that time effectively blocked the abandonment of the easement–resulting in a permanent taking. *See id.*; *see also id.* at 1234 n.7 ("This case does not involve, and we do not herein address, whether the issuance of the NITU in fact involves a compensable temporary taking *when no [trail use] agreement is reached*.") (emphasis added).

Since *Caldwell*, the Federal Circuit has reinforced the foundation for the bright-line rule adopted by this Court today: the consummation of a trail use agreement during the pendency of an STB-issued NITU effects a *permanent* Fifth Amendment taking.  *See, e.g.*, *Ladd v. United States*, 630 F.3d 1015, 1025 (Fed. Cir. 2010) (defining a temporary taking in a rails-to-trails case as occurring "where no trail use agreement is reached" following the issuance of a NITU and, conversely, signifying a permanent taking occurs when a trail use agreement is reached), *cited in Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020) ("It is likewise not meaningfully disputed before us that, if the negotiations for a trail conversion had succeeded, the resulting indefinite federal-law continuation of the easement would have been a categorical taking . . . ."); *see also Memmer v. United States*, 50 F.4th 136, 145 (Fed. Cir. 2022) ("To begin, we disagree with the government that a physical taking cannot occur when a NITU ends *without either a trail-use agreement* or the consummation of the railroad's abandonment.") (emphasis added).[31]  What may happen afterward does not alter the legal consequence of that confluence of events.

The government argues that the STB's November 14, 2023 decision to reopen and revoke the January 10, 2020 NITU "'cut short' any taking premised on the Trails Act, making the alleged taking temporary."  ECF 172 at 12.  In support, the government principally relies upon the following passage from *Memmer*:

---

[31] Factually distinguishable from this case, in *Caquelin* and *Memmer*, the NITUs expired by their own terms after no trail use agreement was reached, the railroads affirmatively abandoned the rail lines as authorized by the STB, and the properties encumbered by the easements reverted to the landowners in fee simple.  *See Caquelin*, 959 F.3d at 1364–65; *Memmer*, 50 F.4th at 140–41.  Similarly, in *Ladd*, the NITU expired by its own terms after no trail use agreement was reached and the STB authorized the railroad to abandon the rail line.  *See* 630 F.3d at 1017–18.  As of the date of the *Ladd* opinion, although the railroad noticed the abandonment of a portion of the railway easement, the extended deadline for complete abandonment had not yet expired for the balance of the rail line.  *Id.*

> We agree with the government that the taking ended upon expiration of the NITU . . . . This is so because it was on that date that the United States was no longer responsible for mandating the continuation of the easement because, from that point forward, the decision rested solely in the hands of [the railroad].

50 F.4th at 146 (citation omitted). As noted in *Memmer*, the NITU expired by its own terms without the consummation of a trail use agreement or other consequential intervening acts. Here, in contrast, CSX and GHL executed a trail use agreement–and transferred ownership of the railway easement through a duly-recorded quitclaim deed–during the pendency of the January 10, 2020 NITU. These actions were taken, moreover, with the express permission of the STB over the objection of the City of St. Petersburg. Whatever import of the STB's decision to reopen the matter years afterward and rescind its authorization post hoc, it does not impact the liability determination in this case.[32] As initially conceded by the government, the moment CSX and GHL executed the trail use agreement the government effected a permanent taking of the railway easement severing or abutting plaintiffs' properties.[33]

The government's reference to the NITU issued by the STB on January 12, 2024, underscores the permanent nature of the Fifth Amendment taking in this case. In *Barclay v. United States*, the Federal Circuit rejected the notion that the STB's successive issuance and vacating of NITUs, even if expired, somehow creates multiple takings of the same reversionary interest in a railway easement. 443 F.3d 1368, 1375–76 (Fed. Cir. 2006). This is particularly true where, as here, the successive NITU is issued provisionally dependent upon whether the revocation of the initial NITU is sustained. Indeed, if the current negotiations between CSX/GHL and the City of St. Petersburg are ultimately successful, title to the railway easement would transfer from GHL (not CSX) to the city. This fact demonstrates the tacit acknowledgment by the government of the continuing legal import of the June 21,

---

[32] This Court leaves to the Eleventh Circuit to decide in the first instance whether the STB is authorized to reopen and revoke NITUs after a trail use agreement is executed and, to that end, whether the STB can continuously monitor and act upon the progress (or lack thereof) on a post-NITU rail-to-trail conversion. At most, the Eleventh Circuit's decision would be persuasive authority for this Court and the Federal Circuit to consider moving forward.

[33] Defendant's comparison of this rails-to-trails case to the government's issuance (or denial) and subsequent reconsideration of permits or regulations is flawed. Critically missing from defendant's analogy is the consequential intervening action(s) taken by non-government entities (i.e., CSX and GHL) based upon the government's authorization in place at the critical juncture and the landowner's inability to stop the proverbial train after it left the station.

2021 trail use agreement executed during the pendency of the January 10, 2020 NITU.[34]

For these reasons, the Court confirms its August 19, 2021 grant of partial summary judgment in favor of the plaintiffs on the issue of liability, concluding the STB facilitated and effected a permanent taking of plaintiffs' properties as of January 10, 2020. Defendant's motion for reconsideration is DENIED.

## II. Damages

"When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002)). In these cases, courts must ask: "What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?" *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950). The concept of just compensation thus requires consideration of not only the equity due the party whose property is taken but the public fisc which must bear the burden of payment. As the United States Supreme Court made clear over a century ago: a property owner "is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." *Bauman v. Ross*, 167 U.S. 548, 574 (1897); *accord United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961) ("The guiding principle of just compensation is reimbursement to the owner for the property interest taken. 'He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more.'") (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)).

To objectively balance the inverse interests of the impacted property owner(s) and the public fisc, courts use "fair market value" to measure just compensation. *United States v. 50 Acres of Land*, 469 U.S. 24 35 (1984) ("[J]ust compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual owner."). "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (quoting 26 C.F.R. § 20.2031–1(b)). Fair market value is assessed based on the date the taking occurred. *50 Acres*, 469 U.S. at 29 (citing *Olson*, 292 U.S. at 255)*; accord*

---

[34] It is not lost on the Court that, if the statute of limitations came into play between the issuance of the original and provisional NITUs in this case, the government would no doubt cite these same Federal Circuit cases in support of the argument that plaintiffs' Fifth Amendment takings claims are time-barred.

*United States v. Clarke*, 445 U.S. 253, 258 (1980) ("The value of property taken by a governmental body is to be ascertained as of the date of taking.") (citing *United States v. Miller*, 317 U.S. 369, 374 (1943)).

"Where the interest taken is less than the total estate, just compensation is determined by reference to the difference between fair market value immediately before the taking and the fair market value of the property remaining immediately after the taking." *Cloverport Sand & Gravel Co. v. United States*, 6 Cl. Ct. 178, 188 (1984) (citing *Miller*, 317 U.S. at 376) (additional citations omitted). This approach similarly applies when the partial interest taken is through easement. In such cases, "the conventional method of valuation is the before-and-after method, i.e., the difference between the value of the property before and after the Government's easement was imposed." *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015) (internal quotation marks and citations omitted); *see also Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980) (where the United States takes less than an entire parcel, the "before and after" valuation "is generally the simplest and perhaps the most widely used approach" that "serves to lessen the pitfalls and problems that arise when a series of factors affecting value are added together to arrive at a total severance damage determination").

The ultimate determination of just compensation is typically informed by the testimony of expert witnesses who develop opinions of market value. "Appraisal experts employ several generally accepted appraisal methods in the valuation of real property. The most frequently used method, the comparable sales approach, uses as evidence of market value sales of other properties that are reasonably similar to the property to be appraised." *Cloverport*, 6 Cl. Ct. at 188–89; *see also Yaist v. United States*, 17 Cl. Ct. 246, 257 (1989) ("The most frequently employed technique to determine the fair market value is the comparable sales approach, which is generally considered the best indication of the value of the property.") (citations omitted). The reason is simple: an examination of comparable sales (i.e., similar properties recently sold in the area) generally produces a reliable metric upon which to assess the value of the property at issue.[35] *Cloverport*, 6 Cl. Ct. at 189. "Qualified and knowledgeable witnesses may give their opinion or estimate of the value of the property taken, but to have probative value, that opinion or estimate must be founded upon substantial data, not mere conjecture, speculation or unwanted assumption. It must have a rational foundation." *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966) (citations omitted). Otherwise stated,

---

[35] The sales comparison approach uses relevant units of comparison (e.g., lot, acre, square footage), "the similarities and dissimilarities of each comparable [sale] are considered and weighed" against the subject property, and "[t]he most market-oriented unit of comparison is used to reconcile a single value indication." PX-003 at 29. The other generally accepted valuation methods include the cost approach (i.e., depreciated replacement cost) and the income capitalization approach (i.e., present value of the income stream likely to be produced over property's economic life). *See Cloverport*, 6 Cl. Ct. at 189. At trial, both parties' experts employed the comparable sales method.

> The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value–a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

*Olson*, 292 U.S. at 257.

Finally, in an inverse condemnation case such as this, "[o]nce a taking has been established, it is the landowner who bears the burden of proving an actual loss has occurred." *Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1323 (Fed. Cir. 2015) (citing *Bd. of Cnty. Supervisors of Prince William Cnty., Va. v. United States*, 276 F.3d 1359, 1364 (Fed. Cir. 2002)); *accord Hedstrom Lumber Co. v. United States*, 7 Cl. Ct. 16, 28 (1984) ("The burden of establishing the value of the property taken rests upon the claimant."); *Sowards*, 370 F.2d at 92 ("The burden rests upon the owner to establish by competent evidence his right to substantial compensation.") (citations omitted). "To carry its burden, the landowner must show actual damages 'with reasonable certainty,' which 'requires more than a guess, but less than absolute exactness.'" *Otay*, 779 F.3d at 1323 (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010)).

## A.  Collective Edge

Collective Edge seeks $5.955 million in just compensation attributable to the rail-to-trail conversion of the easement running along the southern border and southwest corner of its property.  Defendant counters that the maximum just compensation due is $1.485 million. The $4.47 million delta lies in the parties' "before" condition valuations in light of the government's adoption of Collective Edge's "after" condition value at trial.[36]  In their valuations of the "before" condition, the parties' expert witnesses relied upon different property dimensions, cited contrasting comparable sales, and clashed in their quantitative and qualitative adjustments.  These issues are addressed seriatim.

---

[36] Defendant's acquiescence was expressly limited to the bottom line post-taking value of $14.435 million, seeking to avert cross-examination of their expert witness on the issue.  *See* Trial Tr. Vol. 8 at 1589, 1629–30.  Defendant did not concede Collective Edge's underlying data or methodology in reaching that figure.

### 1. Property Size

Plaintiff claims the Collective Edge parent parcel is 74,135 square feet in the "before" condition, whereas defendant asserts the subject property is 72,721 square feet. In measuring the property and assuming an extinguished railway easement, however, Collective Edge includes a nearly 1,000 square foot alley and the public sidewalk running along 1st Avenue South. The problem with these assumptions are that Collective Edge did not own the contested alley on the day of take and the sidewalk was and remains an undevelopable public thoroughfare.

When PTM Partners purchased the property on October 7, 2019, the 997 square foot alley[37] separated two parcels of the Collective Edge property on its southern border along 1st Avenue South under the railway easement. Although the City of St. Petersburg was in the process of vacating the alley, the cross-examination of plaintiff's expert appraiser Chad G. Durrance[38] makes clear the formal transfer of ownership–from the city to Collective Edge–did not occur until two years *after* the January 10, 2020 date of take:

> Q:  . . . And just taking a step back, the alley – the vacation of the 11-foot-wide alley that's being discussed here, this is the alley – the south alley that we're discussing with respect to the Collective Edge property, right?
>
> A:  That is true, yes.
>
> Q:  . . . And at the top, it states that this meeting where the recommendation was made took place on February 10th, 2022. Do you see that?
>
> A:  I do.
>
> Q:  And February 10th, 2022, is exactly two years after our date of take; is that right?
>
> A:  That is correct, yes.

---

[37] Plaintiff's expert reported the vacated alley as measuring 964 square feet. Defendant's expert was silent on the size. Although de minimis and immaterial to the ultimate conclusion reached, the Court adopts the 997 square feet measurement documented by Pinellas County. *See* PX-007 at 23.

[38] The Court qualified Mr. Durrance and allowed his testimony "as an expert in the field of real estate appraisal." Trial Tr. Vol. 3 at 515. President of Durrance & Associates, Mr. Durrance is a licensed real estate appraiser in Florida and a designated Member of the Appraisal Institute. PX-005 at 70. Primarily representing condemning authorities, Mr. Durrance has worked on 100 or more eminent domain projects in the past five years, providing expert testimony in cases before federal and state courts. Trial Tr. Vol. 3 at 502, 506–07.

Trial Tr. Vol. 5 at 867–68.[39]  As such, Collective Edge cannot viably claim a taking of the alley, let alone a compensable one:

> To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation. Therefore, if the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end.

*See Beres v. United States*, 143 Fed. Cl. 27, 54 (2019) (cleaned up) (collecting cases).

Plaintiff's inflated valuation goes beyond the tableside math of multiplying the disputed 977 square feet by Mr. Durrance's proffered value of $275 per square foot, totaling $274,715.  Because Collective Edge did not own the alley until over two years after the taking, Mr. Durrance should not have presumptively included the land in his overall assessment of the highest and best use of the parent tract.  At a minimum, he should have factored in a discount.   The location and utility of the alley underscores its inherent value: separating two portions of the Collective Edge property with frontage on 1st Avenue South facing Tropicana Field and the planned Historic Gas Plant District Redevelopment.   Plaintiff's valuation of the "before" condition did not sufficiently take these factors into account.

Plaintiff's "before" condition valuation also includes the concrete public sidewalk running along 1st Avenue South, albeit with the caveat that it cannot be developed.  Tempering his analysis, Mr. Durrance testified at trial:

> That's why that is part and parcel of the parent tract as of the date of value, that sidewalk. *And my value does not assume it will be developed.* They have other sidewalks on their property they are building with their own money that are also part of my value.  So that's what I'm trying to say.   All of these portions of the land, the overall site, that might not have a building on them.  It might be open space, which is required.  But nobody's deducting for open space on these sites.  So my value is parent tract, and that's what it is, and that's why I did it.

Trial Tr. Vol. 5 at 875 (emphasis added).   Mr. Durrance's appraisal report and testimony miss the mark.  His inclusion of the square footage of the sidewalk running

---

[39] On direct, Mr. Durrance testified he included the alley in his valuation due to the "reasonabl[e] certain[ty]" the local government would approve the conveyance in the near future.  Trial Tr. Vol. 4 at 682.

along 1st Avenue South overestimates the size of the parent parcel and thus inflates its valuation. In equating a *public* sidewalk to open spaces or walkways on *private* property, Mr. Durrance ignores critical differences in the right to exclude and the options of design and development. Notwithstanding his qualification regarding the undevelopable surface, his inclusion of the square footage of the public sidewalk in the "before" condition valuation unnecessarily inflated his opinion. Mr. Durrance's calculations are devoid of any reduction attributed to the public sidewalk.

## 2. Comparable Sales

In assessing the value of the Collective Edge property in the "before" condition, plaintiff's expert appraiser used the sales comparison approach, comparing the parent tract to recent high-rise mixed-use development sales in St. Petersburg. Specifically, Mr. Durrance identified four comparable sales ranging in size from 19,383 to 63,188 square feet which sold for between $201 and $260 per square foot from 2019 to 2022. *See* PX-003 at 34. In contrast, defendant's expert appraiser, Christopher D. Starkey,[40] identified four different comparable sales ranging in size from 19,378 to 36,300 square feet which recently sold in the area for between $126 and $232 per square foot. DX-004 at 41; PX-007 at 24. After factoring in their respective quantitative and qualitative adjustments, discussed *infra*, Mr. Durrance valued the Collective Edge property in the "before" condition at $275 per square foot, whereas Mr. Starkey came in at $230 per square foot. Neither witness carried the day, resulting in the Court using plaintiff's expert to guide the valuation discussion and defendant's expert to point out flaws, extract concessions, and offer alternative approaches and calculations consistent with the parties' respective burdens of proof.

The comparable sales Mr. Durrance selected were limited to properties he considered either "inferior" or "slightly inferior." Not one was deemed "superior," "slightly superior," or even "similar." In failing to provide the Court a bracketed range of comparable sales within which the Collective Edge property fell, Mr. Durrance's valuation appeared exaggerated and inflated.[41] As explained in the

---

[40] The Court qualified Mr. Starkey and allowed his testimony "as an expert in [the field of] real estate appraisals." Trial Tr. Vol. 7 at 1417. In addition to his role as the Senior Managing Director for the Orlando-based Integra Realty Resources, like Mr. Durrance, Mr. Starkey is a real estate appraiser licensed in Florida and a designated Member of the Appraisal Institute. *Id.* at 1410–11, 1414. Mr. Starkey previously has been qualified as an expert witness in federal and state courts on twenty or more occasions. *Id.* at 1414–15.

[41] Mr. Durrance outlined the rationale for his choice of "inferior" and "slightly inferior" comparable sales on direct examination and, in ruling on a subsequent objection from defendant's counsel on redirect examination counsel, the Court explicitly reaffirmed the same:

Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA), commonly referred to as the "Yellow Book":

> To develop a valid indication of value of the property under appraisal by the use of qualitative analysis, *it is essential that the comparable sales utilized include both sales that are overall superior and overall inferior to the subject property*. If this is not done, the appraiser will have merely demonstrated that the property is worth more than a certain amount (if all of the sales are inferior to the subject property) or less than a certain amount (if all of the sales are superior to the subject property).

Yellow Book § 2.3.3.4 (2016) (emphasis added).[42]  Although adherence to the Yellow Book is not required when retained by a private party (as opposed to the federal government), the Court found Mr. Durrance's appraisal report and trial testimony wanting in this regard.[43]  The Court did not walk away from either the site visit or trial with the impression that the Collective Edge property was far and away the most valuable piece of real estate on the market in and around St. Petersburg in recent memory.

---

> My understanding of the testimony was that this witness – sustained.  Sorry – that this witness testified that he only used or wound up using [inferior] or slightly [inferior] comparables because those were the most applicable and comparable to the subject properties and not any buildings that may or may not have been superior.

Trial Tr. Vol. 5 at 928–29.

[42] Adherence to the UASFLA/Yellow Book is required for federal land acquisitions.  Established by the Interagency Land Acquisition Conference, the Yellow Book provides guidance on the appraisal process, including methods, procedures, and reporting requirements.  *See* https://perma.cc/F24K-AK3J (last visited May 14, 2024).

[43] When pressed on any instructions he received regarding the Yellow Book on cross-examination, Mr. Durrance testified:

> A:   If I had a client that – even if they're not the federal government and they told me, "You must follow everything in [the] Yellow Book," and I decided to accept that assignment, then, yes, I probably would.  I just don't recall ever being given the instruction, "Mr. Durrance, I'm hiring you.  And you agree to be hired, right?  And as part of that, you agree to follow [the] Yellow Book to a T."  Maybe that's happened and I'm unaware of it, but I don't recall it.

> Q:   And so just circling back here, so in this case, you made the decision not to comply with [the] Yellow Book?

> A:   To not follow [the] Yellow Book, yes.

Trial Tr. Vol. 4 at 795.

The Court was similarly reluctant to adopt Mr. Starkey's appraisal.[44, 45] First, defendant abandoned Mr. Starkey's "after" condition value for the Collective Edge parcel, leaving the Court with no choice but to adopt Mr. Durrance's bottom line post-taking value.  Next, as Mr. Starkey's cross-examination makes clear, he failed to distinguish between the quantitative and qualitative adjustments made throughout his report:

Q:      Mr. Starkey, does that any – does that further inform you on the appropriate use of a quantitative rather than a qualitative adjustment for market conditions?

A:      Again, I don't believe that there is a distinct – I believe that I'm making appropriate adjustments in my report.  I don't believe that – I believe I made qualitative adjustments.  And with regards to the reconciliation to the number within the range of the comparable sales that I analyzed, I referenced and analyzed the prior sale.  So inherent in my reconciliation is the change in market conditions that were reflected when I said Sale 1 was slightly inferior; Sale 2 was inferior; Sale 3 was inferior; Sale 4 was inferior.  So they were all inferior.  So in my reconciliation, I need it to be something higher because of changes in market conditions.  And so in reconciling where I was in that range, I referenced the prior sale and I said, "Hey, this imputes a difference of 10.75 percent, which is generally supported by the

---

[44] Mr. Starkey's expert reports were based on the dimensional characteristics prepared by Senior Land Planner and Vice President Bryon K. Klepper of Kimley-Horn and Associates, Inc.  The Court qualified Mr. Klepper and allowed his testimony "as an expert in land use planning."  Trial Tr. Vol. 6 at 1045.  Mr. Klepper has more than thirty years' experience in land planning–particularly urban growth boundaries and community redevelopment–and he is certified by the American Institute of Certified Planners.  See DX-001 at 79.  Mr. Klepper has testified before numerous municipal governments in Florida on land use and development matters.  Trial Tr. Vol. 6 at 1041–42.

[45] In advance of trial, the Court made clear that only those exhibits substantively discussed during trial could be moved into evidence.  As explained, the Court would not admit documentary evidence en masse without witness testimony to ensure context.  This directive applied with equal force to multi-paged documents and expert witness reports: only those pages actually discussed during trial could be admitted.  Otherwise, the Court would face a trove of documents and reports to figure out possible relevance post-trial.  Such a practice would invite challenges to the Court's interpretation and reliance (or silence) on evidence admitted but not actually addressed at trial.  With respect to Mr. Klepper's expert report, in particular, the government raised concerns about retaining the necessary context where he cross-references rather than restates certain premises.  To that end, the Court allowed additional pages of Mr. Klepper's report to account for those cross-references notwithstanding the over inclusion of certain material, particularly where the expert witness presented alternative scenarios in his report not pursued at trial.  In those limited circumstances, to ensure fairness and protect plaintiffs' interests on a potential appeal of this matter, plaintiffs did not waive their right to object to future citations to superfluous materials not the subject of actual trial testimony.

> market.  *So inherent in my valuation and in my reconciliation is that quantitative adjustment.*
>
> Q:    So is it your testimony that proper appraisal methodology is that quantitative adjustment is rolled into a qualitative adjustment?
>
> A:    I think it's appropriate methodology when there's only one factor that supports a market conditions adjustment that it needs to be considered in the analysis.  And in this case, it was, and it was considered within my reconciliation.

Trial. Tr. Vol. 8 at 1608–09 (emphasis added).  Taken together, although Mr. Starkey identified many of the perceived shortcomings in Mr. Durrance's appraisal, his report could not (and did not) serve as a stand-alone substitute for the Court's independent assessment.

As a final matter, plaintiffs retained John A. Kilpatrick, Ph.D. to assess Mr. Durrance's and Mr. Starkey's conflicting reports and testimony.[46]  But Dr. Kilpatrick neither appraised the Collective Edge property nor independently analyzed the experts' underlying data.  In fact, as highlighted in Dr. Kilpatrick's cross-examination, his testimony amounted to witness vouching for Mr. Durrance and a blanket critique of Mr. Starkey:

> Q:    . . .  [L]et's talk about the alley briefly. Dr. Kilpatrick, in your report, you opine that the fact of vacation of the alley is a matter for the Court, correct?
>
> A:    Yes.
>
> Q:    Yet, you opine that Mr. Starkey's area is not credible because it leaves out the alley, right?
>
> A:    Yes.
>
> Q:    You didn't cite to any evidence of the alley being vacated in your report?
>
> A:    That's correct.

---

[46] The Court qualified Dr. Kilpatrick and allowed his testimony "as an expert in the field of real estate appraisal."  Trial Tr. Vol. 8 at 1687.  Among his credentials, Dr. Kilpatrick is a real estate appraiser (licensed in all fifty states and the District of Columbia), Managing Director of Greenfield Advisors, a Uniform Standards of Professional Appraisal Practice (USPAP) instructor, and co-author of "Rails-to-Trails Corridors" in the book *Corridor Valuation*: *An Overview and New Alternatives* published in 2019 by the Appraisal Institute.  *See generally* PX-008.

Trial Tr. Vol. 8 at 1732–33.   Time and again, Dr. Kilpatrick issued blanket endorsements of Mr. Durrance's appraisal and summarily disagreed with Mr. Starkey's work.   *See, e.g.*, *id.* at 1703–04, 1712–13.[47]   Notwithstanding his experience and proficiency in the field of appraisals, Dr. Kilpatrick's testimony offered little value to the Court's determination of the Collective Edge property value.

### 3.   Quantitative and Qualitative Adjustments

The Court's chief concern in Mr. Durrance's quantitative adjustments is his market conditions adjustment of two percent per month (twenty-four percent per year) to the comparable sales from the date of contract through the January 2020 date of value.   In support, Mr. Durrance proffered certain market data and factors, including: the general appreciation in property values in the area between 2017 and 2019, the impact of the Coronavirus disease (COVID-19) pandemic on the local real estate market, and an asserted thirty-one percent increase in rent in the greater Tampa-St. Petersburg area in 2021.   When tested, the surface-level market data lacked context and critical analysis.

In appraising the Collective Edge Property, for example, Mr. Durrance failed to adequately account for the immediate, one-time bump in property value resulting from PTM Partners' assemblage of the four parcels in October 2019.[48]   Indeed, the real estate investment firm paid a total of $13.5 million for the four parcels that

---

[47] In assessing Mr. Durrance's inclusion of the public sidewalk in his valuation of the Collective Edge property, Dr. Kilpatrick testified:

> Q:   And what about the sidewalk?   What's your understanding of whether it was included or not included by the experts in their calculation of the proper land calculation for the before?
>
> A:   Well, my understanding is that the area in question, which includes the sidewalk, was included by Mr. Durrance but not by Mr. Starkey.
>
> Q:   And did you find that appropriate?
>
> A:   Yes.

*Id.* at 1712–13.

[48] In the world of real estate appraisals:

> The concept of assemblage is based on combining parcels for the purpose of establishing the highest and best use of a single parcel. . . . In essence, the assemblage of parcels expands the range of potential highest and best uses because the increased size results in more benefits. It helps lessen the impact of local development standards, takes advantage of any physical opportunities specific to the particular properties and can work to overcome certain types of site constraints that impact future development.

*See* https://perma.cc/R7HD-UKXH (last visited May 14, 2024).

comprise the present Collective Edge property.  In just three months, Mr. Durrance claims that same (now assembled) property rose in value to $20.39 million.[49]  In extrapolating this short-term impact on market appreciation to future purchases, Mr. Durrance fails to appreciate the immediate versus longer-term impact of assemblage on property appreciation.  As such, Mr. Durrance's accounting for this one-time bump, and not the post-assemblage long-term forecast, skewed his comparable sales adjustments.

Mr. Durrance's analysis of condominium sales further underscores the Court's skepticism regarding his two percent per month market conditions adjustment. Citing his purported review of 3,000 sales in St. Petersburg, Mr. Durrance's sources behind this metric began *and ended* with Multiple Listing Service (MLS) data.[50]  He offered nothing beyond the high-level executive summary of market sale trends in the general vicinity, without regard to critical valuation details such as location, condition, and size of the residences:

Q:      So you pulled the aggregate data from MLS for this table here about the condo sales; is that fair?

A:      Yes is the answer.  Condo sales in Downtown St. Pete.  That's correct.

Q:      . . . But this – your report doesn't analyze the type of condo being sold, right?

A:      Residential, yes.  It's residential condominiums.  I should have clarified that.

Q:      . . . Residential, but no analysis of the age of the condo being sold?

A:      That is correct.

Q:      . . . No analysis of the size of the condo?

A:      That is also correct.

---

[49] Even taking into account the January 2019 contract date, the Court is struck by the nearly $7 million (sixty-six percent) jump in claimed value over the course of a year.

[50] In the real estate industry, "MLSs are private databases that are created, maintained and paid for by real estate professionals to help their clients buy and sell property.  In most cases, access to information from MLS listings is provided to the public free-of-charge by participating brokers."  *See* https://perma.cc/N3U9-J5VL (last visited May 14, 2024).  Notwithstanding the import of this database, the Court was reluctant to endorse this source without context or critical analysis.  *See* https://perma.cc/NY28-4EQS (last visited May 14, 2024).

Q:      . . . And no analysis of the condition, new, renovated?

A:      That is also correct.

Q:      . . . And then no analysis of, say, what development the condos are located in?

A:      That is correct.

Trial Tr. Vol. 5 at 853.

Next, Mr. Durrance does not adequately address the COVID-19 pandemic's direct and indirect impact on market rents in and around January 2020. The impact of the pandemic was not felt in the United States until nearly three or four months *after* the date of take in this case.[51] Indeed, the influx of out-of-state homebuyers and renters moving to Florida–driven by the pandemic and a nationwide shift to remote work–contributed to a staggering and unprecedented rise in rent (i.e., twenty-four to thirty-two percent).[52] Mr. Durrance's thirty-one percent spike in market rents in the greater Tampa-St. Petersburg area in 2021 inflated his quantitative adjustment–a regret he acknowledged on cross-examination. Trial. Tr. Vol. 5 at 855 ("This [2021 rental data] was put in here because at the time we were preparing this appraisal, I was reading the Tampa Bay Business Journal and it was in there. And I thought, 'Let's put it in there.' In hindsight, I wish I did not.").[53] Notwithstanding his citation to this data point, Mr. Durrance did not discount or otherwise qualify his proffered $275 per square foot valuation of the Collective Edge property.

---

[51] *See, e.g.*, https://perma.cc/L2WA-GXHS ("March 15, 2020[:] States begin to implement shutdowns in order to prevent the spread of COVID-19.") (last visited May 14, 2024).

[52] *Compare* https://perma.cc/4LVT-US36 (examining the "abnormal" increase in Tampa-St. Petersburg market rents between early 2020 and 2022 at "a clip [] researchers had never previously recorded") (last visited May 14, 2024) *with* https://perma.cc/A827-5A9J (reporting that cities in Florida were showing signs of a slowdown in 2023 in market rent increases, largely due to companies instituting return-to-office mandates and/or returning to pre-pandemic employment policies) (last visited May 14, 2024).

[53] On redirect examination, Mr. Durrance added:

> Rental rates are pertinent and relevant relative to apartments, multistory apartment complexes, of which there are many in Downtown St. Pete. *But to be fair, that was 2021 data. And it's not like some of the other data where you're establishing a trend over time, before the date of value, after the date of value. That was a specific point in time in 2021.* And if I had it to do over again, I would not have included just that year. I put it in there because when I was doing the appraisal, I read the article. I thought, well, here's just another piece of data, overwhelming data, I will tell you, that prices are going up in St. Pete. So that's – that's my testimony on that.

Trial Tr. Vol. 5 at 921 (emphasis added).

Turning to the Gas Plant Building and its impact on valuation, Mr. Durrance found the highest and best use of the Collective Edge property in the "before" condition was for redevelopment, albeit while preserving this so-called historical building.  Notably, his analysis on this issue defers heavily (if not completely) to perceived community sentiment rather than what use could produce the highest value, taking into account what was physically possible, legally permissible, and financially feasible.  To contextualize his appraisal approach, Mr. Durrance outlined the choice–or, in his view, the lack thereof–faced by real estate investors managing development projects in St. Petersburg's Edge District:

> It's the best path forward if you want to develop the site, just like some of the other market examples we've looked at, where older buildings not on any historic registry were left on the site even though they were initially targeted for demolition.  You know, you take your – either go ahead and fight city hall and fight the neighborhood district, the EDGE Council, fight Preserve the 'Burg, or say, "You know, what? We're going to incorporate it into the development, make it nice, and get this thing moving."  So you've got choices. And so for most of these projects, it seems the best choice is to incorporate buildings that are deemed by the community to be of historic significance to them. And that's what I've seen on several occasions.

Trial Tr. Vol. 4 at 712–13.  Addressing the "maximally productive" use of the Collective Edge property, Mr. Durrance also testified:

> Here's my conclusion, and this will answer the question directly – is that, given your choice, typically, instead of spending money on modifying an older building and not knowing what you're getting into – and, in fact, I did confirm and speak with the clients' rep[resentative] – and I have trouble pronouncing his last name – Mr. Pantuliano.  When you get into an old building like that, you don't know what you're getting into.  So the preference of a developer is scrape the site clean, build new.  And, in fact, they have had cost overruns not on what they're building new, the Moxy Hotel, but on trying to rehab and restore that old building, which is the reason, given their choices, they prefer to tear it down.  So maximally productive, if you could, get rid of it.  If it – if there was – if it was completely free and voluntary, you would scrape the site, would be my opinion.  So it would be maximally productive to get rid of it, is my answer.  And I think that answers the question.

Trial Tr. Vol. 5 at 864–65.

To be clear, the Gas Plant Building is not on any historic registry or otherwise protected from demolition by law or regulation.  *See id.* at 861–62.  Nor did the

purchase and sale agreement prohibit PTM Partners from demolishing the building. *Id.* Indeed, Mr. Durrance conceded on cross-examination that external community pressure led PTM Partners to preserve the Gas Plant Building. *See id.* at 859–65. Thus, notwithstanding Mr. Durrance's subjective view on the timeworn path of least resistance, PTM Partners had–and made–the business choice to retain the Gas Plant Building and foster goodwill within the community while satisfying their investor's expectations. As candidly explained at trial by Mr. Pantuliano:

> Well, as we were – when you're developing a site, it's the ultimate problem-solving endeavor, and what we originally wanted to do there is to do a larger-scale development. Best and highest use was probably a multifamily building. As we got more into the details of the site, the encumbrances on the site, and, you know, what was good and what was challenging, let's say, what came to pass is that we wouldn't be able to do anything of a higher density. And the best use – the most efficient use would probably be a hotel use, which doesn't require the same type of square footage that maybe multifamily would require. And there was a series of optimizations at play. We could conceivably build a hotel that was Central Avenue-focused, leave the building, which would add to the character of the site, continue to add to the tremendous character that Central Avenue has, while making the City and the neighborhood quite happy that we were voluntarily keep[ing] a building that has some charm. Needs a lot of work, but has some charm. And that would over all be a creative to the overall design of the project. So once it became apparent that we were not going to be able to put anything of normal density and have normal relationships with some of the perimeter of the site, *we deemed that the best way to check a lot of boxes, make the City, neighborhood, and our investors happy was to keep that building and then [build] on the remaining 1.2 acres.*

Trial Tr. Vol. 2 at 99–100 (emphasis added). Mr. Pantuliano readily acknowledged that PTM Partners raises outside money to fund its real estate acquisition and development strategies, cyclically creating a timeline on which investors expect a prompt return on their investment. To this end, the investment firm sought to avoid a potential–and protracted–community tussle and consequent construction delay, opting to develop a hotel and restore the Gas Plant Building. The Fifth Amendment does not provide for passing along or otherwise imposing upon the taxpayers the financial consequences of business decisions made *before* the taking.

The more significant consequence of Mr. Durrance's preservation-based analysis is the claimed lost access to and frontage along the heavily trafficked corridors of 1st Avenue South and 13th Street South. Appraising the property through this lens skewed his side-by-side comparison with recent land sales and

contributed to his lower valuation of the property in the "after" condition. As stated in his appraisal report:

> The new easement eliminates frontage and access along 1st Avenue South and effectively eliminates access along 13th Street South, due to the existing historic building. All of the sales, with the exception of the prior sale of the subject, ha[ve] access/frontage along multiple roadways and therefore are estimated to be superior to the subject. As stated above, the buyers were optimistic of being able to acquire the former railroad right-of-way and obtaining frontage/access to 1st Avenue South. As such, the prior sale of the subject is also estimated to be superior to the remainder relative to access/frontage.

PX-003 at 42. However, as explained *supra*, PTM Partners made the business decision *not* to raze the Gas Plant Building, voluntarily foregoing access to and frontage along 13th Street South. This election undermines Mr. Durrance's claim that the rail-to-trail conversion "effectively eliminates access along 13th Street South" and rendered comparable sales with roadway access superior in the "after" condition. *See id.*

Even if defendant had *not* adopted plaintiff's "after" value, Mr. Durrance's diminution value again sidesteps this business decision and the practical realities of property ownership on this corridor. To satisfy investor expectations on a reasonable timeline, PTM Partners designed and developed the property based upon known conditions rather than delay the project for greater clarity on the future of the railroad corridor. As the Court viewed firsthand during the site visit, PTM Partners developed the property facing toward Central Avenue South and away from 1st Avenue South and Tropicana Field. Rather than develop the site to blend into or otherwise interact with the future public trail, PTM Partners made the business decision to build an above ground parking garage and ramp along 1st Avenue South, presumably to shield its investment from the initial uncertainty of the railroad corridor.[54] As highlighted by Mr. Pantuliano, PTM Partners retained the original design for the property even after it became increasingly clear that the rail line would be converted into a linear public space:

> Q:     . . . When Collective Edge learned about the notice of interim trail use, so the easement for trail use, to be less legal here, that didn't cause Collective Edge to change its design plans, correct?

---

[54] *See, e.g.*, Trial Tr. Vol. 2 at 121 ("Everything was treated from a design standpoint as basically the *end of the earth*. . . . We had no ability to permanently traverse the CSX parcel.") (emphasis added).

A: No.  But a lot of that is timing too, right?  I mean, we have a responsibility to execute on a plan for a multitude of reasons, and timing is very important.  The idea here was that we always wanted to develop the property, and we made a lot of decisions based on being able to develop the property as timely as possible.  Given the crazy times also that this occurred in.

Q: Right.  And so you're just talking about timing.  The easement for trail use was issued January 10th, 2020, correct?

A: . . . That's what I – yes, I believe so.

Trial Tr. Vol. 2 at 144–45.[55]

For these reasons, the Court finds Mr. Durrance's appraisal is inflated, exaggerating the Collective Edge property's size, value, and potential in the "before" condition.  To account for the questionable assumptions, the Court reduces plaintiff's proffered valuation of the Collective Edge parcel in the "before" condition by fifteen percent, resulting in a valuation of $17.332 million (i.e., $20.39 million x .85).  Consistent with defendant's limited trial concession–or to be precise, face value "adoption"–the Court accepts plaintiff's proffered property valuation of $14.435 million in the "after" condition.  Accordingly, Collective Edge is awarded just compensation in the amount of $2.897 million, plus interest.

## B. Ferg's South

Ferg's seeks $13.125 million in just compensation for the rail-to-trail conversion of the 100-foot wide easement running through the center of the Ferg's South property.  Put simply, the taking devastates the future use of the Ferg's South property: splitting the land housing Ferg's Sports Bar & Grill into two largely undevelopable triangular swaths on opposite corners of the parent parcel.  Acknowledging the impact of the rail-to-trail conversion, the government proffers the just compensation due is $10.45 million.  In doing so, defendant again adopted plaintiff's bottom line "after" valuation (i.e., $2.64 million) at trial.[56]  Thus, the $2.675 million delta in damages lies in the parties' "before" condition valuations.  In reaching the competing proffers, the parties' expert witnesses both cited the Collective Edge property but otherwise settled on different comparable sales and differed in their approaches to qualitative and quantitative adjustments.

---

[55] In responding to this question, Mr. Pantuliano pointedly defined the relationship by and between PTM Partners and its Collective Edge investors as follows: "[W]e have a *responsibility* to execute on a plan for a multitude of reasons, and *timing is very important*."  Trial Tr. Vol. 2 at 145 (emphasis added).

[56] In adopting this figure, defendant again noted they were not conceding the propriety of the underlying data or the methodology used to generate the "after" valuation.  *See* Trial Tr. Vol. 8 at 1588–89, 1629–30.

In appraising Ferg's South in the "before" condition, plaintiff's expert appraiser, Mr. Durrance, compared the parent tract to recent high-rise mixed-use development sales. Specifically, he identified Collective Edge and three other comparable sales ranging in size from 19,383 to 81,580 square feet which sold for between $174 and $260 per square foot. *See* PX-001 at 27. Conversely, defendant's expert appraiser, Mr. Starkey, identified Collective Edge and three different comparable sales ranging in size from 19,378 to 62,240 square feet which recently sold for between $126 and $232 per square foot. *See* DX-005 at 37–38; PX-007 at 45. After factoring in their respective quantitative and/or qualitative adjustments, Mr. Durrance valued the Ferg's South property in the "before" condition at $275 per square foot, whereas Mr. Starkey came in at $230 per square foot. As with the Collective Edge property, neither presentation was determinative, again resulting in the Court's use of Mr. Durrance to guide the valuation discussion and Mr. Starkey to pressure test Mr. Durrance's data and assumptions.

Similar to his approach with the Collective Edge property, Mr. Durrance's comparable sales were limited to properties he considered either "inferior" or "slightly inferior." Not one was "superior," "slightly superior," or even "similar." *See* PX-001 at 32. Mr. Durrance's continued election not to adhere to the guidance offered in the Yellow Book in this regard left the Court wanting a comparable sale he considered superior or even similar.[57] Combined with this shortcoming, as examined *supra*, Mr. Durrance's use of the Collective Edge property as a comparable sale highlights the inflated nature of the Ferg's South appraisal. Coincidentally, after quantitative and qualitative adjustments, Mr. Durrance valued both the Collective Edge and Ferg's South properties at exactly $275 per square foot. As stated with respect to the Collective Edge property, the Court did not walk away from either the site visit or the trial with a firm belief that the Ferg's South property was the most valuable piece of real estate in St. Petersburg's Edge District or the Golden Rectangle. Rather, the takeaway was that Mr. Durrance's valuation was inflated.

Addressing quantitative and qualitative adjustments regarding the Ferg's South property, Mr. Durrance similarly adopted the surface-level market data research relied upon in the Collective Edge property appraisal, including his proffered two percent per month (twenty-four percent per year) market conditions adjustment. For the reasons explained *supra*, the Court finds this approach and resulting valuations inflated Mr. Durrance's appraisal.

Despite these lingering questions and concerns, the Court could not simply turn to the government's counter appraisal. As with the Collective Edge property, defendant abandoned Mr. Starkey's "after" condition value for the Ferg's South

---

[57] As explained *supra*, while Mr. Durrance was not required to adhere to the Yellow Book, his failure to offer a bracketed range of comparable sales with Ferg's South diminished the utility and credibility of his proffered valuations.

parcel.  Further, in defending his "before" valuation, Mr. Starkey's comparable sales analysis–particularly his side-by-side comparison of the Collective Edge and Ferg's South parcels–did not instill the necessary confidence in his approach.  For example, notwithstanding the "irregular" shape of the Collective Edge parent tract compared with the Ferg's South "square" (or "rectangular") shape, Mr. Starkey determined their shapes were "similar."  Trial Tr. Vol. 8 at 1611–12.  Turning to the properties' respective street access and exposure, Mr. Starkey admitted error and then sought to minimize his initial opinion that Collective Edge was superior to Ferg's South on these metrics:

> Q:    So you believe in your professional opinion as an appraiser that the intervening trail easement has no effect on the Collective Edge property fronting on 1st Avenue South [facing Tropicana Field]?
>
> A:    From an investor's standpoint looking at sales in the Downtown St. Pete area and the availability of land, I believe that the prices for the two sites would be the same for various reasons.
>
> Q:    Well, you don't say they're the same, Mr. Starkey.  You say [Collective Edge] is better.  You rank it superior.  On access and exposure.
>
> A:    This is in the before, correct?
>
> Q:    Yes.
>
> A:    . . . So in the before, we have the access from 1st Avenue.  We have access from 13th Street.  We have access from Central and we have access from Commercial Avenue South.
>
> Q:    Mr. Starkey, you're using the sale.  This is the Ferg's South appraisal.
>
> A:    Yes.
>
> Q:    And you are using the sale of Collective Edge.
>
> A:    Okay.
>
> Q:    The sale of Collective Edge does not include this red area.
>
> A:    Okay.

Q:    Does it?

A:    So if that is the case, there may be an error that access and exposure would be similar and not superior.  I think I referenced this sale as similar overall, so I don't believe it moves the needle significantly.

*Id.* at 1612–14.  As noted above, Mr. Starkey either did not make a quantitative adjustment or, at the very least, failed to distinguish between the adjustments (i.e., quantitative versus qualitative) made in his appraisal report.  Specifically, Mr. Starkey testified:

Q:    So is it your testimony that proper appraisal methodology is that a quantitative adjustment is rolled into a qualitative adjustment?

A:    I think it's appropriate methodology when there's only one factor that supports a market conditions adjustment that it needs to be considered in the analysis.  And in this case, it was, and it was considered within my reconciliation.

*Id.* at 1609.  At bottom, Mr. Starkey's written appraisal and oral testimony effectively challenged Mr. Durrance's opinions but did not withstand the necessary scrutiny to merit the Court's adoption of the independent "before" condition valuation of the Ferg's South property.

Dr. Kilpatrick's testimony again added little to the Court's evaluation of the competing Ferg's South valuations.  He did not independently appraise the parcel of land or analyze the underlying data upon which the parties' expert witnesses relied:

Q:    . . . But my question was just to confirm that you didn't independently analyze the underlying data on which Mr. Durrance relied.

A:    That's correct.

Q:    . . . Yet, you determined the data was adequate?

A:    That's correct.

Trial Tr. Vol. 8 at 1736.  Similar to his proffered opinions regarding the Collective Edge property, Dr. Kilpatrick's testimony about the Ferg's South property amounted to little more than witness vouching for Mr. Durrance and a blanket critique of Mr. Starkey's work.  It did not move the needle.

For the foregoing reasons, the Court concludes that Mr. Durrance's appraisal of the Ferg's South property in the "before" condition–like his valuation of the Collective Edge property–is exaggerated and inflated. To account for the carried over questionable assumptions, the Court reduces plaintiff's proffered value of the Ferg's South parcel in the "before" condition by ten percent, resulting in a valuation of $14.1885 million (i.e., $15.765 million x .90). The five percent diferential in reductions is attributable to the additional issues identified in the Collective Edge appraisal (e.g., property size, street frontage and access, pre-taking development decisions). Consistent with defendant's limited trial concession, the Court accepts plaintiff's proffered property valuation of $2.64 million in the "after" condition. Accordingly, Ferg's is awarded just compensation for the Ferg's South property in the amount of $11.549 million, plus interest.

## C. Ferg's North

Ferg's seeks $1.361 million in just compensation for the rail-to-trail conversion of the easement running through the eastern upland area of the Ferg's North property. Defendant did not offer an expert witness appraisal report or testimony for this property, instead endeavoring to chip away at plaintiff's valuation through cross-examination. In valuing the "before" and "after" conditions, plaintiff's appraisal expert, Mr. Durrance, cited comparable sales and made a series of quantitative and qualitative adjustments similar to–but not as extensive as–the assumptions made in his other valuations. The Court largely agrees with his analyses.

Relying upon mapping from Rahenkamp Design, Mr. Durrance described the Ferg's North property as a 0.78-acre (33,954 square feet) vacant parking lot adjacent to the restaurant site (i.e., Ferg's South). Critical here, Booker Creek and the adjoining gully run through the western portion of the property, reducing the upland developable area to 18,482 square feet. In the "before" condition, Mr. Durrance determined that the highest and best use of the property was for infill multi-family housing.[58] After adjusting his analysis for market conditions, he cited comparable sales ranging from $50 to $91 per square foot, leading to his $75 per square foot valuation.[59] Conversely, in the "after" condition, Mr. Durrance deemed the property predominantly encumbered by the 100-foot wide easement running through and

---

[58] "Infill development" is the process of densifying cities by developing on vacant or under-utilized parcels of land within existing urban areas. Varying in scale, small-scale projects such as the highest and best use proposed by Mr. Durrance, are typically characterized by the construction of rowhouses, courtyard housing, low-rise multifamily developments, or duplex, triplex, or fourplex buildings. *See* https://perma.cc/WRF6-289R (last visited May 10, 2024).

[59] Notwithstanding the Court's reservations about Mr. Durrance's market conditions adjustment, addressed *supra*, the impact of his two percent per month (twenty-four percent per year) adjustment to the Ferg's North appraisal is comparatively de minimis. Standing alone, Mr. Durrance's adjustment does not justify a reduction in the overall valuation.

along the eastern portion of the property, rendering Ferg's North effectively undevelopable.[60]

Justifying his nominal $25,000 valuation in the "after" condition, Mr. Durrance credibly explained:

> So trying to find properties that are similar in Downtown St. Pete that have sold recently relative to the date of value of January 2020 or even expanding it out, that type of configuration where you can only put a [400] or 500-square-foot home on it maybe, I didn't find any sales like that. You're not going to find them. So what I did was looked at some of the sales that we do have, and I looked at the price that the developer paid for the land, divided it by the number of units proposed for that property. A lot of times developers will talk the price per unit that I'm building. So in the dirt or in the land on several of these sales, I have it in the appraisal – I think it was [$25,000], maybe [$]50,000 a unit for some of these small micro units. And so I'm looking at this, 400 square feet, 500 square feet, one unit, and that's how I came to my value, $25,000 per unit.

Trial Tr. Vol. 4 at 671–72.[61]  Combined with defendant's election not to produce an expert witness report or testimony, the Court finds plaintiff provided ample evidence to value the Ferg's North property in the "before" and "after" conditions. As clearly revealed during the site visit, the well-positioned creek-side property is devastated by the government taking in this case: eliminating the property's access along the highly trafficked Central Avenue and leaving room for one 500 square foot micro-dwelling (i.e., approximate size of an average two-car garage). Plaintiff must be justly compensated. Consistent with Mr. Durrance's appraisal, the Court finds the value of the Ferg's North property "before" the taking was $1.386 million and adopts the proffered nominal $25,000 "after" valuation. Ferg's is therefore awarded just compensation for the Ferg's North property in the amount of $1.361 million, plus interest.

---

[60] *See, e.g.,* Trial Tr. Vol. 4 at 671 ("About the best you can do with it if you're going to build a rectangular residential unit on there – it's I think [400] or 500 square feet, 400 square feet, the Central Avenue frontage has been eliminated, be it pedestrian or vehicular. You know, Booker Creek is what's left on Central Avenue. So your – your frontage and access would be from 1st Avenue North and you have limited frontage and limited access along 1st Avenue North that's left. And there's really not a whole lot you can do with it and that's the remainder.").

[61] It is not lost on the Court that Mr. Durrance excluded the square footage of Booker Creek and the adjoining gully because the land was undevelopable yet did not do the same for the public sidewalk running along the southern portion of the Collective Edge property.

### D.  Lopez Property

As noted above, under the Fifth Amendment, the government must pay for what it takes.  *Rasmuson*, 807 F.3d at 1345 ("The landowner 'must be made whole but is not entitled to more.'") (quoting *Olson*, 292 U.S. at 255).  To that end, prior to determining the amount of just compensation due, plaintiffs must establish actual ownership of the adversely possessed or condemned land.  *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 519 n.12 (Fed. Cir. 2011) ("It is plaintiffs' burden to establish cognizable property interests for purposes of their takings . . . claims.") (citing cases), *quoted in Pressley v. United States*, 159 Fed. Cl. 159, 167 (2022) ("To demonstrate a cognizable property interest in a Trails Act case, a plaintiff must establish ownership in land adjacent to the railroad line described in the NITU and that ownership in that land can be traced to the railroad company's acquisition.") (citing *Brooks v. United States*, 138 Fed. Cl. 371, 377 (2018)).  The landowners must then present credible evidence regarding the highest and best use of the property immediately before and after the government action effecting the taking–the delta serving as the just compensation due, plus interest.  *Rasmuson*, 807 F.3d at 1345 ("Landowners are . . . generally entitled to the fair market value of their land, which is defined as what a willing buyer would pay in cash to a willing seller at the time of the taking. And in the easement context, the conventional method of valuation is the before-and-after method, i.e., the difference between the value of the property before and after the Government's easement was imposed.") (internal quotation marks and citations omitted).  The Lopez property presents novel questions regarding both property size and potential use, addressed seriatim.

### 1.  Property Size

### a.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A "genuine" dispute exists where a reasonable factfinder "could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Material" facts, in turn, are those "that might affect the outcome of the suit."  *Id.*  In deciding motions for summary judgment, the Court must draw all inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case."  *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  "Once the moving party has satisfied its initial burden, the opposing party must establish a

genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 248).  Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

### b.  Demonstrated Ownership

The Lopez property is comprised of all or parts of nine (of 128) adjoining platted lots once known as Harvey's Subdivision.  When C. A. Harvey acquired the pre-platted land on February 28, 1906, the southwest corner of the property was already encumbered by the right-of-way railway easement then operated by the Sanford and St. Petersburg Railroad (f/k/a Orange Belt Railway).  ECF 134-4 at 3 (conveyance of property "less the riteaway [sic] of the Sanford and St. Petersburg railroad across the south west [sic] corner").  Once platted, the 100-foot-wide railway easement diagonally traversed decreasing swaths of lots 17 through 23 of Harvey's Subdivision.  Interestingly, the nebulous southwest corner of lot 17–triangulated by a large tree, 16th Street North, and Burlington Avenue North–does not appear to fall within the railway easement.[62]  As further explored below, the Lopezes claim the entirety of lots 17 to 23 plus unencumbered lot 24 whereupon their 8,316 square foot two-story warehouse sits.

Nearly a century after Harvey's Subdivision was formed and platted, the Lopezes acquired the property in fee simple by general warranty deed dated March 11, 2004:

> That part of Lots 17, 18, 19, 20, 21, 22 and 23 lying East of the Atlantic Coast Line Railroad right-of-way (now Seaboard Coastline Railroad) and all of Lot 24, Block L, CORRECTED MAP OF HARVEY'S SUBDIVISION, according to the map or plat thereof, as recorded in Plat Book 3, page 45, of the Public Records of Hillsborough County, Florida, of which Pinellas County was formally a part.

DX-247.  The deed makes no affirmative conveyance or representations with respect to the part of lots 17 to 23 encumbered by the railway easement or the above-described southwest corner of lot 17.

Consistent with the foregoing, on June 12, 2021, the parties stipulated that the Lopezes owned land adjacent to the railway right-of-way easement described in the January 10, 2020 NITU on the day of issue.  A year later, on June 22, 2021, the parties further stipulated that, in accordance with Florida state law, the Lopezes "own the

---

[62] Notwithstanding the Court's repeated inquiries–including while standing on the subject property during the site visit–neither the Lopezes nor the government could provide definitive measurements or conclusively demonstrate ownership of the southwest corner piece of lot 17.

land underlying the easement segments of the right-of-way adjacent to their respective properties *to the centerline of the easement*." ECF 33 at 2 (emphasis added); *see Castillo v. United States*, 952 F.3d 1311, 1321 (Fed. Cir. 2020) ("[U]nder Florida law, the centerline presumption applies to the railroad right-of-way context . . . ."). The parties simultaneously noticed: "All title-related issues are now resolved for all [p]laintiffs." ECF 34 at 1. Citing these stipulations, defendant includes only half of the width of the railway easement, and excludes the southwest corner of lot 17, in the government's property size measurements and resulting valuations. Plaintiffs aver the Lopezes are entitled to just compensation taking into account the entire width of the railway easement traversing lots 17 to 23 as well as the southwest corner of lot 17, and that the centerline presumption extends into 16th Street North.[63] The delta in the parties' respective calculations is 3,917 square feet.[64]

Over defendant's objection, and consistent with the escape clause included in the parties' joint stipulations,[65] the Court afforded the Lopezes every opportunity to demonstrate their ownership of the land encumbered by, and to the west of, the railway easement. Despite exhausting all reasonable avenues, the Lopezes failed to meet their burden of persuasion. Instead, the Court is left with lingering questions regarding who owns the western half of the railway easement abutting the Lopez property and the seemingly orphaned southwest corner of lot 17. Those unanswered questions cannot simply inure by default to the Lopezes' financial windfall at taxpayers' expense.

As quoted above, the March 11, 2004 general warranty deed conveying the property to the Lopezes is clear and unambiguous, readily distinguishing the *parts* of land comprising lots 17 to 23 lying *east* of the railway easement from *all* of lot 24 where there is no easement. The deed is notably silent regarding the transfer of any land encumbered by, and lying west of, the railway easement. While this may be rationalized vis-à-vis lots 18 to 23, where the railway easement abuts and traverses 16th Street North, the same cannot be said for the southwest corner of lot 17.[66] Under

---

[63] The Lopezes' reliance upon their initial disclosure to the government depicting the "area of take" as inclusive of the entire railway easement and the southwest corner of lot 17 is misplaced. First, the May 1, 2020 production predates the joint stipulation by two years. Second, the As-Built Survey dated March 1, 2004, upon which the May 1, 2020 rendering is based, includes the following disclaimer: "THIS SURVEY DOES NOT REFLECT OR DETERMINE OWNERSHIP." PX-78 at 3.

[64] For clarity, throughout the litigation of this matter, the Court routinely referred to this issue as "the disputed 4,000 square feet."

[65] Both stipulations included the following caveat at the outset: "The stipulations are subject to modification or revocation by either party should that party determine that a stipulation contains or is based on an inaccurate fact or application of law to fact." ECF 33 at 1 (Docket No. 20-34); ECF 10 at 1 (Docket No. 20-159).

[66] The Court is unpersuaded that the deed's reference to the Corrected Map of Harvey's Subdivision (filed March 21, 1906) creates an ambiguity inviting the introduction of parole evidence to better

Florida law, the clarity of the conveyance in the deed should have ended the Court's inquiry. *See Rogers v. United States*, 184 So.3d 1087, 1100 (Fla. 2015) ("When a deed is unambiguous and sufficient on its face to show the grantor's intent as to the property described and the estate conveyed, extrinsic evidence is not admissible to vary the terms.") (citations omitted).   Nevertheless, the parties were asked to continue researching the illusive question: if the Lopezes do not own lots 17 to 23 underlying and lying west of the railway easement, who does?

Exhaustive title searches revealed inconsistent conveyance language throughout the twentieth century.   For example, a fee simple deed executed on October 27, 1933, conveyed lots 17 through 24 of Harvey's Subdivision "except the right of way of the Atlantic Coast Line R.R." from The Willson-Chase Company to D. G. Maxwell.   ECF 148 at 93.   Identical language was used in a subsequent fee simple deed dated February 13, 1935, conveying the land from L. M. Dakin, as receiver of the First National Bank of St. Petersburg, Florida to Charles F. and Sarah B. Walker.   *Id.* at 98.   These title transfers clearly included the land underlying and lying to the west of the railway easement encumbering lots 17 to 23.   However, eight months later, without explanation, in a warranty deed dated November 6, 1935, the Walkers described their conveyance to Gust and Martha S. Blair using language similar to that found in the Lopez deed:

> That part of Lots 17 to 23 inclusive, Block "L", Harvey's Subdivision, *East of the Railroad*, according to Plat 3, page 45, Hillsborough County Records, of which Pinellas County was formally a part.

*Id.* at 101 (emphasis added).[67]   Identical language was employed two months thereafter when the Blairs conveyed the property to the Dew Furniture Company through a warranty deed.   ECF 149 at 3.   In a series of transfers since October 28, 1964–including the March 11, 2004 Lopez conveyance–the warranty deeds, foreclosure judgments, and certificates of title continued to describe the land as the *entirety of* lot 24 and the *parts of* lots 17 through 23 "lying East of" the railway easement.   ECF 149 at 20, 34, 43, 63, 66, 68, 90.   Perhaps it was the elevation of the deed from fee simple to warranty that caused the Walkers and their successors in ownership to cull the conveyance of the land encumbered by and to the west of the railway easement.   Or maybe the conveyors resigned themselves to the fact that the rail line was permanent, and no adjoining landowner would ever own the property in fee simple again.   It is also conceivable, although unlikely, that the Walkers intended

---

understand and interpret the plain language of the title transfer.  Put simply, the rendering captures all 128 lots of the historic subdivision and identifies the railway easement with a single diagonal line failing to denote its width, thereby serving as a general frame of reference rather than contradicting the specific conveyance language.  *See* DX-248.

[67] Between 1936 and 1964, unencumbered lot 24 was purchased and sold as a separate tract of land. *See, e.g.*, ECF 149 at 6, 17, 20.

to retain (or unwittingly retained) an ownership interest in the disputed land. The parties offered no definitive answers, and the Court's musings do not confer title to the Lopezes by default.

Addressing the evolving conveyance language over the last century, the government cites Florida's Marketable Record Title Act, Fla. Stat. § 712.01 *et seq.*, enacted to streamline title searches, foster certainty, and avoid the exercise undertaken here. *See id.* § 712.10. In sum and substance, the Florida law limits the legal implications of title searches to the most recent conveyance recorded at least thirty years prior to the disputed ownership. *See id.* § 712.01(6) ("'Root of title' means any title transaction purporting to create or transfer the estate claimed by any person which is the last title transaction to have been recorded at least 30 years before the time when marketability is being determined. The effective date of the root of title is the date on which it was recorded."). Applied to the facts of this case, the Lopez property's "root of title" dates back to the June 12, 1973 warranty deed conveying the subject property from L. W. and Helen S. Baynard to B. Brooks and Jean D. Campbell. Materially identical to the language of the 2004 (Lopez) deed, the 1973 (Campbell) deed conveys:

> Lot 24, and that part of Lots 17, 18, 19, 20, 21, 22, and 23, Block L, HARVEY'S SUBDIVISION, lying East of the Atlantic Coastline Railroad right-of-way . . . .

ECF 134-4 at 97. There is no mention in the conveyance of the land encumbered by or to the west of the railway easement. As noted above, this language is substantively uniform from 1973 through 2004. As such, the deed language employed before 1973–and in particular in the mid-1930s (quoted above)–does not vest title of the disputed land in the Lopezes.[68]

Beyond the eastern edge of the railway easement, as memorialized in the parties' joint stipulation, the government concedes that the Lopezes own the eastern half of the railway easement running through lots 17 to 23 (i.e., land to the centerline of the railroad corridor). Defendant's concession is consistent with the governing law:

> Long ago, the Supreme Court of the United States described the centerline presumption as a "familiar principle of law" to the effect that "a grant of land bordering on a road or river, carries the title to the centre of the river or road, unless the terms or circumstances of the grant indicate a limitation of its extent by the exterior lines."

---

[68] The government's stated concern of potential exposure to double liability merits de minimis weight given the exhaustive title search conducted by both parties, coupled with the approaching expiration of the six-year statute of limitations from the date of the January 10, 2020 taking.

*Castillo*, 952 F.3d at 1320 (quoting *Banks v. Ogden*, 69 U.S. 57, 68 (1864)).  The *Castillo* court went on to hold that "[a] rail line meets the definition of an artificial monument under Florida law."  *Id.* at 1321.  For this reason, the Court rejects the Lopezes' assertion that the joint stipulation of their ownership interest to the centerline of the railway easement further extends to the centerline of 16th Street North by double-operation of the centerline presumption: first to the centerline of the railway easement and then, after leapfrogging the western half of the easement, to the centerline of the nearest street.  Save lot 24, the Lopez property does not abut 16th Avenue North.  Lot 17–particularly the amorphous southwestern corner– underscores the inappropriateness of ceding the disputed 3,917 square feet by default.[69]

At bottom, just compensation must be based upon demonstrated ownership of the subject property.  The Court concludes the western boundary of the Lopez property is the eastern edge of the railway easement for lots 17 to 23 and 16th Avenue North for lot 24.  Taking into account the centerline presumption, and consistent with the parties' joint stipulations, the property must be appraised using the government's measurements of the "before" and "after" conditions of the Lopez property.  The Court's conclusion on this issue is consistent with the Lopezes' treatment and understanding of the subject land over the last twenty years.  Their mortgage and property taxes cover the entirety of lot 24 and that part of lots 17 to 23 east of the railway easement.  *See, e.g.*, ECF 149 at 102 (mortgage); ECF 144-5 at 2–3 (property taxes); ECF 144-6 at 2–3 (same).  In his deposition and at trial, moreover, Mr. Lopez testified he had "no idea" who owned the southwest corner of lot 17 and, instead, thought it was "part of the street."  ECF 144-9 at 5–6; Trial Tr. Vol. 2 at 218.

Accordingly, plaintiffs' motion for partial summary judgment on the Lopez property size is DENIED and defendant's dispositive cross-motion on this issue is GRANTED.  The Court adopts the government's "before" and "after" property size calculations of 34,729 square feet and 21,271 square feet, respectively.

---

[69] Plaintiffs' reliance upon the strips and gores doctrine–the common law predecessor to the centerline presumption–to bolster the Lopezes' ownership claim to the disputed land is similarly misplaced.  As recently explained by this Court:

> In some jurisdictions, the strips-and-gores doctrine is known as the centerline presumption. According to this doctrine, when a deed conveys land bounded by a railroad right of way, the boundary of the land is the centerline of the railroad right of way. . . . The strips-and-gores doctrine does not help ascertain the property interest conveyed; the doctrine only illuminates the boundary of the property interest granted.

*Price v. United States*, 156 Fed. Cl. 281, 295 (2021) (citation omitted).

## 2. Rezoning

The market value of land taken by the federal government is determined by exploring the "highest and best use" of the property at or about the time of the claimed taking. This concept–codified in § 4.3 of the Yellow Book–dates back to the Supreme Court's 1934 decision in *Olson*:

> The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.

292 U.S. at 255 (citing cases).

In determining a property's highest and best use, each potential use must be analyzed using four criteria: (1) physical possibility, (2) legal permissibility, (3) financial feasibility, and (4) degree of profitability. Yellow Book, § 4.3.2. Property can be appraised using a proposed use–as opposed to its current actual use–when there is "a showing of reasonable probability that, at the time of the taking, the land was both physically adaptable for such use and that there was a need or demand for such use in the reasonably near future." *Bd. of Cnty. Supervisors,* 276 F.3d at 1365 (omitting citation). However, "[e]lements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration." Yellow Book, § 4.3.1. (citing *Olson*, 292 U.S. at 257). Resolution of this issue is largely dependent upon the Lopezes' presentation of preponderant evidence regarding the appropriate zoning for the subject property. More specifically, the Court must consider whether it is reasonably probable the Lopez property will be rezoned from Industrial Traditional to Downtown Center-2 within the near future of the already four-year-old taking.

When the Lopezes purchased the property in March 2004, and continuing to date, the land was zoned for industrial use (i.e., Industrial Traditional) with a similar future land use designation (i.e., Industrial General). Notwithstanding the facts that the government facilitated the conversion of the rail-to-trail easement by issuing the NITU on January 10, 2020, and the subject property continues to be zoned industrial with a similar future land use designation, plaintiffs contend it is reasonably probable the property will be rezoned from Industrial Traditional to Downtown Center 2 within the near future of the now four-year-old taking. Critical here, the Lopezes' valuation calculations are based on a rezoning designation of Downtown Center 2, whereas defendant's calculations use the current Industrial Traditional zoning designation. This difference contributed to a sizeable gap between the parties' calculated damages.

In assessing the reasonable probability of rezoning, plaintiffs' expert land use planner, Mr. Rahenkamp, relied heavily on the various plans and goals for the City of St. Petersburg's downtown development, "includ[ing] the St. Pete Vision 2020 and StPete2050 visioning plans, the City's Comprehensive Plan, the Intown West Community Redevelopment Area (CRA), the Central Avenue Revitalization Plan and The EDGE District Improvement Plan . . . ."  PX-150 at 10.[70]  Referencing the *StPete2050: Progress and Opportunities Report* (Oct. 2020) and the *StPete2050: A Vision Plan for St. Petersburg* (May 2021), Mr. Rahenkamp proffered that the city officials have "identified a surplus of industrial land within the City of St. Petersburg through 2050, with the most viable industrial lands remaining outside of the downtown area."[71]  PX-150 at 10.  In assessing the likelihood of an amendment to Future Land Use Map of the Lopez property in particular, Mr. Rahenkamp looked at a number of factors, including:

- The incompatibility of the property with the city's long-term growth plans for the downtown St. Petersburg area.

- "[T]he incongruity of industrial uses of the [property] with active and future mixed use residential, commercial, and office redevelopment within the neighborhood."

- The property's location at a corner with significant frontage along 16th Avenue North, which "serves as a gateway into downtown St. Petersburg."

---

[70] According to Mr. Rahenkamp, these plans "are implemented through the . . . 'Downtown Center Districts' standards contained in Section 16.20.120 of the City's Land Development Regulations." PX-150 at 10.

[71] Of note, the *StPete2050: A Vision Plan for St. Petersburg* cited by Mr. Rahenkamp explains the historic connection between the rail line and industrial zoning as well as the need to balance the preservation of industrially-zoned lands for continued job and economic growth with the gentrification of the downtown area:

> St. Petersburg's has historically been developed as a resort and retirement community. Lands originally [set] aside for industrial uses were limited in area and located in linear fashion adjacent to the two railroad lines which brought goods and services into the City. . . . Having available sites and buildings for existing and potential businesses is critical for economic development and employment growth. Protecting these areas from transition to other uses has long been a staple of City land use policy. However, City land use policy also allows for conversion of these lands to other uses when they are no longer viable for employment generating purposes. Solutions to improving the viability of these areas can in-part include a reassessment of zoning limitations with an eye towards expanding allowable uses beyond the traditional industrial pallet.

*See* https://perma.cc/Y92E-QQNV (last visited May 14, 2024).  The cited balancing of interests equally reflects and supports both parties' positions on this issue.

- The property's "location adjacent to previously rezoned properties that are now within the . . . 'Downtown Center Districts.'"

- The property's "inclusion in parts of the design standards for the [Downtown Center] and the projected surplus of Citywide industrial lands through 2050."

*See* PX-150 at 10–11.  Taken together, Mr. Rahenkamp opined it is "highly probably" city officials will approve a future land use redesignation of the Lopez property from Industrial General to Central Business District.  *Id.*

Addressing his "expect[ation]" that the Lopez property would be reciprocally rezoned from Industrial Traditional to Downtown Center 2 "consistent with the existing zoning immediately to the south of the site," Mr. Rahenkamp further pointed to policies found in Chapter Three (Future Land Use Element) of the *City of St. Petersburg's Comprehensive Plan* (Jan. 2022), including:

[] LU3.22: Industrial uses shall be concentrated in suitable locations taking advantage of existing infrastructure and natural site characteristics.

[] LU3.26a: Plan amendment applications that propose changing underperforming industrially designated areas (Industrial General or Industrial Limited) to a non-industrial designation may be favorably considered if one or more of the following characteristics exist over an extended period of time: 1) vacant or underutilized land; 2) vacant or underutilized buildings; 3) poor quality job creation in terms of pay, employee density and spin-off or multiplier effects; and 4) chronic competitive disadvantages in terms of location, transportation infrastructure/accessibility and other market considerations.

PX-150 at 11; DX-19.  Notably, Mr. Rahenkamp did not take into account Mr. Lopez's representations that he purchased the property solely as a long-term real estate investment and never intended to use the land or the existing building for anything other than personal storage.  *See* Trial Tr. Vol. 2 at 179.

Conversely, defendant's land use expert, Mr. Klepper, relied upon "conversations and email exchanges with Britton Wilson, AICP,[72] of the City of

---

[72] AICP is the acronym for American Institute of Certified Planners.  According to the organization's website:

St[.] Petersburg Planning Department regarding similarly situated parcels that are zoned Industrial."[73]  *See* DX-001 at 48.  As the Court made clear at trial, however, the relevance and admissibility of Ms. Wilson's testimony and any reliance thereon was limited to the following fact: a rezoning application submitted by or on behalf of the Lopezes "never crossed her desk."  *See* Trial Tr. Vol. 5 at 1024 (The Court: "This witness has nothing at all . . . to offer me as the trier of fact as to whether or not a zoning or rezoning of the Lopez property could have happened, would have happened, or did happen.  The only piece that I will say she offered was that, in fact, an application never crossed her desk.").

Citing the "economic value that [i]ndustrial parcels provide in a part of the city with dense residential development," and the limited success of prior rezoning applications, Mr. Klepper reflectively explained:

> Only one time in recent history has an application been successful in amending an industrial designation, which was the Jabil property where the applicant entered into a development agreement to build a certain amount of workforce housing intended to support the neighboring industrial use.  Prior to that application, another applicant seeking to rezone from Industrial was for a sports tourism complex on the former Raytheon property.  That application failed to get County support, so the applicant withdrew after a years' worth of effort.

*See* DX-01 at 48.  The government's expert further pointed to the oft drawn-out processes to redesignate a future land use and rezone a particular property within Pinellas County as an additional impediment in this case.  For these reasons, Mr. Klepper opined that it was "unlikely" the Lopez property would be rezoned on or near the date of take.  *Id.* at 49.

Notwithstanding the parties' diametrically opposed positions, based upon the observations made during the site visit and the documentary and testimonial evidence presented at trial, the Court finds that a rezoning of the Lopez property from Industrial General to Downtown Center 2 while *possible* was not *reasonably probable*

---

The American Institute of Certified Planners provides the only nationwide, independent verification of planners' qualifications.  Certified planners pledge to uphold high standards of practice, ethics, and professional conduct, and to keep their skills sharp and up to date by continuously pursuing advanced professional education.

*See* https://perma.cc/2FP5-C84Q (last visited May 14, 2024).

[73] Defendant called Ms. Wilson as a *fact* witness.  *See* Trial Tr. Vol. 5 at 971.  Ms. Wilson has been a land use planner for twenty years and, for the past five years, has served the City of St. Petersburg as Senior Planner.  *Id.* at 972.  In her current role, Ms. Wilson's primary responsibilities include: "process[ing] land use and zoning amendments and text amendments to both the comprehensive plan and the land development regulations."  *Id.* at 973.  Relevant here, if a St. Petersburg landowner were to seek rezoning of their property, Ms. Wilson would be the city official to process the application.

within a plausible time of the January 10, 2020 take. Plaintiffs thus failed to demonstrate a proper valuation of their property by assuming a Downtown Center 2 rezoning on or about the day of the take.

In the twenty years the Lopezes have owned the property—including the four years since the rail-to-trail conversion—the land has been consistently zoned industrial with a similar future use designation. This point was driven home during defendant's cross-examination of plaintiffs' expert land planner, Mr. Rahenkmap:

Q:      . . . [T]he future land use designation, which we've distinguished from [Industrial Traditional] from the zoning designation, in 2020 was . . . [I]ndustrial [G]eneral; is that right?

A:      Correct.

Q:      . . . At the time you wrote your report in 2022, the zoning designation for the Lopez property was [Industrial Traditional]; is that right?

A:      Yes.

Q:      And the zoning designation at that time – the future land use designation at that time was [Industrial General]; is that right?

A:      Yes.

Q:      . . . And today, January 2024 – 24th of 2024, the zoning designation for the Lopez property remains industrial traditional; is that right?

A:      Correct.

Q:      And same with the future land use, industrial general?

A:      Correct. Yes.

Q:      . . . So, again, all of that unchanged in the last four years?

A:      That's correct.

Q:      At the time you wrote your report, had there been any applications to rezone the Lopez parcel?

A:      Not that I'm aware of.

> Q:   And have there been any applications to rezone – to change the future land use designation of the Lopez property?
>
> A:   No.  I don't believe so.

Trial Tr. Vol. 3 at 388–89.  Further addressing this issue, Mr. Lopez testified:

> I didn't attempt to rezone [the property] because if I had the whole property, then I'd go for it.  Otherwise, my taxes would go up.  And, I mean, the rezoning – so then I thought to myself, I might as well wait until I see exactly what I want to do with it.  And acquiring that property would give me the option to be able to do a larger project.

Trial Tr. Vol. 2 at 191.  This testimony did not tip the scale in the Lopezes' direction.  If anything, it had the opposite effect.  Any perceived uncertainty surrounding the size of the property was conclusively resolved for purposes of this just compensation lawsuit by June 17, 2021, when the January 10, 2020 taking became permanent upon the consummation of the Trail Use Agreement.[74]

The more likely–indeed reasonably probable–rezoning outcome for the Lopez property within a reasonable time of the January 10, 2020 take is a highest and best use consistent with permissible "grandfathered" uses at sites zoned Industrial Traditional.  That is, under Section 16.70.040.1.15 of the City of St. Petersburg's Land Development Regulations, the City's Development Review Commission may approve certain "grandfathered" uses to be reconstructed after the previous structure is demolished or destroyed.  *See* PX-358 at 9.  Relevant here, such uses include:

| | |
|---|---|
| Single Family Dwellings | Multifamily Dwellings |
| Banks (with Drive Thrus) | Uses with Drive Thru Facilities |
| Outdoor Garden Sales | Retail Sales (Neighborhood Scale) |
| Personal Services | Health Clubs (< 5,000 s.f.) |
| Funeral Homes and Mortuaries | Crematories |
| Hospitals | Houses of Worship |
| Libraries | Meeting Halls |

*Id.*  In fact, while touring the Lopez property and neighborhood–particularly north of Burlington Avenue (i.e., the current dividing line between the Industrial Traditional and Downtown Center 2 zoning districts), the Court observed an independently-owned automobile detail and repair shop and other small businesses, a community garden, and newly constructed townhomes.  Even just south of Burlington Avenue (i.e., within the Downtown Center 2 zoning district), the Court walked by a

---

[74] The resulting odd shape of the Lopez property in light of the Court's ruling on the parent tract size *supra*, further diminishes the likelihood of a rezoning.

self-storage facility and a Duke Energy power station[75] in addition to a smattering of mixed-use high-rise apartment buildings in the area.  At bottom, plaintiffs failed to produce sufficient evidence demonstrating a reasonable probability that the Lopez property would be rezoned from Industrial Traditional to Downtown Center-2 within the near future of a taking that happened four years ago.

### 3.  Just Compensation

The Lopezes seek $6.575 million in just compensation for the rail-to-trail conversion of the easement running through and abutting their property.  Defendant counters the maximum compensation due is $590,000.  The $5.985 million delta is, in part, attributable to the property size and rezoning issues now resolved by the Court.  Nevertheless, in valuing the "before" and "after" conditions, the parties' expert witnesses also cited vastly different comparable sales and made different quantitative and qualitative adjustments.  As detailed below, neither expert witness was persuasive, resulting in the Court adopting its own valuation gleaned from data provided by both parties' expert witnesses.

In assessing the value of the Lopez property in the "before" condition, plaintiffs' expert appraiser used the sales comparison approach, comparing the parent tract to recent high-rise mixed-use development sales in St. Petersburg.  Specifically, Mr. Durrance identified five comparable sales ranging in size from 19,383 to 81,580 square feet which sold for between $174 and $260 per square foot.  *See* PX-004 at 29.  Defendant's expert appraiser, Mr. Starkey, in turn, identified four comparable sales ranging in size from 28,979 to 142,309 square feet (developable) which sold for between $21 and $38 per square foot.  *See* DX-006 at 36.  After factoring in their respective quantitative and qualitative adjustments, Mr. Durrance valued the Lopez parent tract in the "before" condition at $205 per square foot, whereas Mr. Starkey came in at $35 per square foot.  *Compare* PX-004 at 29 *with* DX-006 at 39.

Turning to the "after" condition, Mr. Durrance again used the sales comparison approach, comparing the remainder to recent sales in downtown St. Petersburg.  Mr. Durrance identified four comparable sales ranging in size from 5,735 to 22,584 square feet which sold for between $42 and $68 per square foot.  *See* PX-04 at 37.  By contrast, Mr. Starkey identified four comparable sales ranging in size from around 13,056 to 34,935 square feet which recently sold in the area for between $53 and $80 per square foot.  DX-006 at 51.  After factoring in their respective quantitative and qualitative adjustments, Mr. Durrance valued the Lopez property in the "after" condition at $70 per square foot, and Mr. Starkey came in at $75 per square foot.  *Compare* PX-004 at 37, 40 *and* Trial Tr. Vol. 4 at 753–54 *with* DX-006 at 54.

---

[75] *See* Trial Tr. Vol. 3 at 477 ("And then the only other area of inquiry I have, yesterday – sorry.  Monday during our site visit, we walked past [the] Duke Energy Power Station.  My recollection is – but please correct me if I'm wrong – [] that property is southeast of the Lopez property.").

The Court's rezoning decision is at odds with Mr. Durrance's proffered comparable sales–all of which assume the Lopez property is (or would be) zoned Downtown Center 2.  Mr. Durrance did not take into account any risk for the possibility the Lopez property would not be temporally rezoned.  As such, his valuations of the highest and best uses of the Lopez property–particularly in the "before" condition–are exaggerated and inflated.  Further, even if the Court was inclined to use Mr. Durrance's flawed comparable sales, his market conditions adjustment suffers from many of the same issues identified in the Collective Edge and Ferg's South evaluations.  For these reasons, the Court must disregard Mr. Durrance's comparable sales along with his related quantitative and qualitative adjustments in valuing the Lopez property and resulting damages.[76]

On the other end of the spectrum, the Court finds Mr. Starkey's comparable sales equally unavailing.  The oft-quoted mantra "location, location, location" is paramount.[77]  Yet Mr. Starkey's comparable sales are all outside the Golden Rectangle and, consequently, far from the Lopez Property and the Edge District:



*See, e.g.,* DX-006 at 50 (comparable sales for the "after" condition).  Not only do these proffered comparable sales ignore the importance of location in conducting appraisals, but the Yellow Book (to which Mr. Starkey was required to adhere) explicitly cautions against "significant differences" amongst comparable locations. *See* Yellow Book, § 4.4.2 ("Significant differences as to location, size, topography, market area, and recreational potential existed between most comparable sales and the subject property. This makes comparison extremely shaky because of the necessity of substantial adjustments required between the comparable and the subject.") (citing *United States v. Eastman*, 528 F. Supp. 1184, 1186 (D. Or. 1981),

---

[76] To avoid this "all or nothing" dilemma, Mr. Durrance could have used comparable sales with permissible "grandfathered" uses such as single or multifamily dwellings.

[77] *See* https://perma.cc/ZD8R-KK8S (last visited May 15, 2024).

*aff'd*, 714 F. 2d 76 (9th Cir. 1983)).  Given the disparate location of the comparable sales proffered by Mr. Starkey, his analysis offered little value to the Court's valuation decision.[78]

Dr. Kilpatrick's testimony regarding the Lopez property offered little help with valuation, again broadly vouching for Mr. Durrance's approach and generally critical of Mr. Starkey's work.  Considering that rezoning was the linchpin of the contested valuation, the limitations of Dr. Kilpatrick's expert rebuttal testimony were particularly on display:

> Q:     . . . Your report does not analyze the City of St. Petersburg's goals with respect to the Lopez property, does it?
>
> A:     Analyze, no, I don't believe it does.
>
> Q:     And you didn't ask anyone at the City of St. Petersburg whether the Lopez property was likely to be upzoned, did you?
>
> A:     That's correct.
>
> Q:     And you didn't analyze any documents in your report that express an intention by the City to upzone the Lopez property?
>
> A:     That's correct.
>
> Q:     You also did not discuss the future land use plan for St. Petersburg in your appraisal review, correct?
>
> A:     I don't believe I did.
>
> Q:     And you don't note in your appraisal review that the St. Petersburg future land use plan keeps the Lopez property in the industrial category, correct?
>
> A:     I don't think I made mention of that.
>
> Q:     You do not acknowledge in your report that no application for a zoning change has been submitted for the Lopez property, correct?

---

[78] Mr. Starkey readily acknowledged the limitations of his comparable sales.  *See* Trial Tr. Vol. 7 at 1511 ("Your honor, I would say that this was probably the most challenging property of any of them with regards to comparable sales, especially with the concluded reasonable probability of rezoning the property.").  Nor did Mr. Starkey include any "grandfathered" uses in his appraisal.

A:      That's correct.

Q:      And you don't identify any steps that the Lopezes have taken towards changing the zoning of their property, correct?

A:      That's correct.

Q:      And you don't opine as to when the Lopez property is headed for residential and high commercial use, correct?

A:      That's correct.

Trial Tr. Vol. 8 at 1738–40.  As this testimony makes clear, Dr. Kilpatrick did not independently appraise the Lopez property, nor did he analyze the underlying data relied upon by Mr. Durrance or Mr. Starkey.  Like the parties' principal expert appraisers, Dr. Kilpatrick similarly glossed over permissible "grandfathered" uses of the Lopez property and, instead, skipped to the Yellow Book's relationship between market demand and highest and best use on his path to crediting Mr. Durrance's analysis:

> There is no market demand for 1-acre scattered industrial sites in the golden rectangle.  How do we know that?  Because Mr. Starkey couldn't find any comps.  If there was market demand for them, he could have found at least one comp, but he didn't find any.  Conversely, there is evident market demand for mixed-use and high-density residential properties.  And so the Yellow Book would point us in the direction of an adaptation of this property to some use other than its current use.

Trial Tr. Vol. 8 at 1721–22.

Notwithstanding the foregoing, the Court makes the following factual findings based on the record presented in determining the just compensation due the Lopezes as a result of the rail-to-trail conversion.  For the pre-take valuation, the Court adopts an approach analogous to the Ferg's South and Collective Edge properties where Mr. Durrance's calculations were respectively discounted ten percent and fifteen percent to reflect his exaggerated and inflated appraisals.  Here, the Court instead exponentially increases Mr. Starkey's valuation of the "before" condition by 300 percent to account for the location of the proffered comparable sales outside the Golden Rectangle and his failure to factor in potential "grandfather" uses of the property.  The three-fold increase is further justified by Mr. Starkey's facially inexplicable proffer that the Lopez property measured at 34,729 square feet ("before" condition) is somehow worth less than half of the property measured at 21,271 square feet ("after" condition).  The result is a valuation of $105 per square foot (i.e., $35 per square foot x 3).  This adjustment concurrently reflects a near fifty-percent discount of Mr. Durrance's appraisal of $205 per square foot, accounting for his exaggerated

and inflated property size, incompatible comparable sales, and flawed market share adjustments. The $105 per square foot valuation also aligns with the Court-adjusted "before" condition valuations of the properties deemed more valuable in light of their relative shapes and sizes, locations significantly closer to Tropicana Field, and their Downtown Center 2 zoning (i.e., Collective Edge, Ferg's South, Ferg's North).

Turning to the post-take valuation, the parties are just $5 per square foot apart (i.e., $70 versus $75 per square foot). Although the input data used by the expert appraisers in generating the adjusted valuations suffer the same deficiencies detailed above, the bottom-line numbers are at least more consistent with the modest developments reflected in their "after" condition comparable sales. *See, e.g.*, PX-004 at 34–37 (Durrance report); Trial Tr. Vol. 4 at 753–54 (Durrance testimony); DX-006 at 54–55 (Starkey report). They are also more comparable to the authorized "grandfathered" uses outlined above. For these reasons, the Court adopts the government's effective concession that the remainder property is worth $75 per square foot.

Based upon the foregoing, the Lopezes are entitled to just compensation for the rail-to-trail conversion in the amount of $2.052 million, plus interest:

| Condition | Adjusted Valuation | Size (square feet) | Total |
|---|---|---|---|
| "Before" Take | $105 per square foot | 34,729 | $3.647 million |
| "After" Take | $75 per square foot | 21,271 | $1.595 million |
| Just Compensation | *** | *** | $2.052 million |

## III.  Interest

By stipulation dated February 15, 2024, the parties agreed that any just compensation ultimately awarded would include interest calculated in accordance with Moody's Seasoned AAA Corporate Bond Index (Moody's index),[79] beginning on the date of take and continuing through the date of payment, compounded annually. *See* ECF 195; *see, e.g.*, *United States v. Thayer-W. Point Hotel Co.*, 329 U.S. 585, 588 (1947) ("[W]here the United States takes property under its power of eminent domain . . . it has consistently been held that the Fifth Amendment's reference to 'just compensation' entitles the property owner to receive interest from the date of the taking to the date of payment as a part of his just compensation.") (citing cases); *Whitney Benefits, Inc. v United States*, 30 Fed. Cl. 411, 415 (1994) (Where, as here, there is a "long delay since the date of the taking . . . , the award of compound interest

---

[79] *See Sears v. United States*, 124 Fed. Cl. 730, 736 (2016) ("[T]his court has already recognized the Moody's index as 'an indicator of broad trends and relative levels of investment yields or interest rates' and as an instrument that 'cover[s] the broadest segment of the interest rate spectrum.'") (quoting *Pitcairn v. United States*, 547 F.2d 1106, 1124 (Ct. Cl. 1976)); *e.g.*, *Textainer Equip. Mgmt. Ltd v. United States*, No. 08-610, 2014 WL 2938452, at *3 (Fed. Cl. June 30, 2014) (applying Moody's index compounded annually from the date of take until the date of payment).

is not only proper, but its denial would effectively undercut the protections of the [F]ifth [A]mendment to our Constitution.") (citation omitted).   Accordingly, in addition to the principal amount of just compensation awarded, plaintiffs are entitled to receive interest–calculated using Moody's index and compounded annually–from January 10, 2020, until the date of payment.

## CONCLUSION

For the reasons set forth above, defendant's motion for reconsideration (ECF 172) is **DENIED**, plaintiffs' motion for partial summary judgment (ECF 134) is **DENIED**, defendant's cross-motion for partial summary judgment (ECF 144) is **GRANTED**, and plaintiffs are **AWARDED** just compensation in the aggregate amount of **$17.859 million, plus interest**.

Pursuant to RCFC 54(b), there being no just reason for delay, the Clerk of Court shall **ENTER partial Judgment** pursuant to RCFC 54(b) in the following principal amounts for each plaintiff, plus interest calculated using Moody's index, compounded annually, beginning on January 10, 2020, and continuing through the date of payment:

| Name of Plaintiff | Amount of Judgment |
| --- | --- |
| Collective Edge, LLC | $2.897 million |
| Ferg's Sports Bar & Grill, Inc. | $12.910 million |
| Carlos Lopez, Jr. & Colleen A. Lopez | $2.052 million |
| Total | $17.859 million |

Plaintiffs shall **FILE** their application for reimbursement of reasonable attorney's fees and litigation expenses under the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654(c), on or before June 17, 2024.

It is so **ORDERED**.

Armando O. Bonilla
Judge